# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 18, 2011

## STATE OF TENNESSEE v. WILLIAM LAMONT GREEN

**Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1404      Cheryl Blackburn, Judge**

_____

**No. M2010-01631-CCA-R3-CD - Filed July 20, 2011**

_____

A Davidson County Criminal Court jury convicted the defendant, William Lamont Green, of second degree murder, and the trial court imposed a sentence of 23 years' incarceration. In this appeal, the defendant challenges the sufficiency of the convicting evidence. Finding no deficiency in the proof, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, William Lamont Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Jeff Burks and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant's conviction in this case relates to the shooting death of the victim, Marvin Allen Ivory, on March 2, 2007. At trial, the victim's sister, Bobbie Ivory, testified that on March 2, 2007, she had gone to a neighborhood store with two cousins when she saw the defendant, whom she knew as "Little Green," exit a green Thunderbird while talking on a cellular telephone. Ms. Ivory said that the defendant told the person to whom he was speaking that "he needed a gun because this n***** had just got [his] money."

Ms. Ivory and her companions left the market while the defendant was still in the store, and they returned to Ms. Ivory's mother's residence. At approximately 9:30 p.m.,

the victim and Tyrez Jones pulled into the driveway in a silver truck and then immediately "pulled back off." Approximately half an hour later, Ms. Ivory was prompted to look out the window by barking dogs. She saw the victim's apparently driver-less silver truck roll backward into a house. Ms. Ivory and her mother went to investigate and discovered that the victim was unconscious inside the locked truck. The women went to telephone police, and when they finally succeeded in rousing the victim, he told them that he had been shot in the back by "Little Green and Big Yo" because he "found $50.00 and [the defendant] said it was his." Ms. Ivory said that the victim was bleeding profusely from a gunshot wound to the "back part of his body."

Ms. Ivory said that emergency medical personnel "took so long" to arrive that she, her mother, and her cousins drove the victim to Nashville General Hospital at Meharry. From there, the victim was transferred to Vanderbilt Medical Center, where he died the following morning.

The victim's mother, Virginia Ivory, confirmed her daughter's testimony, noting that the victim told them that "Little Green and Big Yo" had shot him. The victim's cousin, April Ivory, confirmed that she and Bobbie Ivory saw the defendant and an individual she knew as "Big Yo" at the neighborhood market but said that she could not overhear the defendant's telephone conversation.

Another of the victim's cousins, Iris Murphy, testified that she was inside the neighborhood market when the defendant, whom she knew as "Little Green," entered the market talking on a cellular telephone. She said that the defendant "was saying he was upset because [the victim] supposed to of took his money and he was mad because he did not have his strap in." She stated that the defendant said he was going to shoot the victim the next time he saw the victim. Ms. Murphy said that after the defendant ended his telephone conversation, he turned to her and told her that he intended to shoot the victim because the victim had taken $50.00 "off the floor" that belonged to the defendant. Ms. Murphy said that she did not take the defendant's threats seriously, but she did telephone the victim and tell him what the defendant had said. She recalled that the victim did not take the threats seriously either. Later on that evening, she learned that the victim had been shot, and she went to her aunt's house immediately. There she heard the victim say that he had been shot by "Little Green and Big Yo."

Tyrez Johnson, the victim's companion on March 2, 2007, testified that he and the victim were "supposed to be going chilling at the hotel with some females," but the victim insisted on making a side trip to speak to "that bitch ass n***** little Green." Mr. Johnson said that the victim told him that he had found $50.00 earlier in the day and that the defendant had claimed the money belonged to him. The victim drove to the defendant's

mother's house and "pulled up kind of aggressive like, like something was fixin [sic] to happen." At that point, the victim and the defendant argued, with the victim being somewhat more aggressive than the defendant. Mr. Johnson said that he did not see a gun in the victim's possession but did see the defendant walk back to his car and arm himself with a handgun. At that point, the victim asked the defendant if he was "pistol playing" him, which Mr. Johnson explained to mean "showing the pistol period." The defendant then shot the victim. Despite his wound, the victim was able to get back into his truck and drive away. Mr. Johnson ran away from the scene and returned to his house, where he went to sleep.

Cousins Temeka Crawford, Malika Riley, and Narkeetha Dillard went to the defendant's mother's house on March 2, 2007, to visit the defendant's nephew, Josh Green. Ms. Crawford recalled that while she was at the house, the defendant arrived and told the gathered teenagers that someone had stolen $50.00 from him and that he was "going to pop" the perpetrator. A short time later, the victim pulled up, the two men argued, and the defendant went to his car and armed himself with a handgun. Ms. Crawford heard the victim say, "[A]re you going to shoot me? I ain't scared of no gun." The defendant then shot the victim, and the victim got back into his truck and drove away. Ms. Dillard confirmed Ms. Crawford's version of events, and added that prior to the victim's arrival, the defendant displayed the firearm and said, "[H]e better not play with me I just bought this strap."

Doctor Amy R. McMaster, the medical examiner practicing for the same private company as the doctor who performed the autopsy of the victim, testified that the victim died from a single gunshot wound to his torso that "entered on the left lower abdomen and exited on the right hip." The bullet injured the blood vessels in the mesentery, which "is the supporting structure of the bowel," and the iliac vessels of the pelvic area. She said "unless [the victim] was shot while standing in a[n] emergency room that had the capability of repairing these wounds, these wounds are fatal wounds."

During cross-examination, Doctor McMaster testified that tests on the victim's blood "revealed the presence of ethanol which is alcohol, drinking alcohol. It revealed THC which is an active ingredient in marijuana. It also revealed cocaine and cocaine metabolites, cocaine metabolites is what your body turns cocaine into in the process of clearing it from the body."

Metropolitan Nashville Police Department Detective Danny Satterfield led the investigation into the victim's murder. He testified that "[t]here was no physical evidence that was located" at the scene of the shooting. After interviewing witnesses, he obtained a warrant for the defendant's arrest. The defendant reported to the police station later that same day and provided a videotaped statement to police. Detective Satterfield said that the defendant initially denied being present at the scene but later admitted shooting the victim

and claimed he did so in self-defense. The defendant's videotaped statement was played for the jury.

At the conclusion of Detective Satterfield's testimony, the State rested.

The defendant's nephew, Joshua Green, testified on behalf of the defendant, that on March 2, 2007, the defendant told him that the victim had threatened the defendant. A short time later, the victim "pulled up aggressively" in his truck. The two men argued, and Mr. Green claimed that the victim called someone on his cellular telephone during the argument and asked the person to "bring that burner thing." Mr. Green "guess[ed]" that "burner thing" was a firearm. He said that the victim was unarmed and standing in the street "swing[ing] his hands" when the defendant aimed the gun and shot the victim.

The defendant testified that he had known the victim for "5 or 6 years" and during that time had known the victim to carry a weapon and be "a hot-headed type person." He said that after the dispute over the $50.00, the victim told him that he would "catch [him] in traffic," which the defendant interpreted to mean that the victim intended to kill him "or something." The defendant denied threatening the victim and specifically denied telling Ms. Murphy that he intended to arm himself and shoot the victim. He claimed that he merely told Ms. Murphy to tell the victim that he wanted his money back.

The defendant testified that late on the evening of March, 2, 2007, he was in front of his mother's residence talking to his nephew and some girls when the victim "pulled up on [him]." He said the victim immediately opened the truck door and they "had words [and] got to arguing back and forth" about the $50.00. According to the defendant, he asked the victim if he wanted to fight, and the victim responded that he did not but that they "can go to guns or something." The defendant claimed that after the victim mentioned guns, "he reached up under his seat as he was getting out," prompting the defendant to return to his own car and get a gun. The defendant said that he aimed the gun "low at the ground" and "shot [the victim] in his leg." He claimed that he purposely aimed low so as to scare the victim. He stated that he "really was not trying to shoot" but believed that the victim was reaching for a weapon. He admitted, however, that he never saw the victim in possession of a weapon.

The defendant testified that after being shot, the victim "got back in the car and left." He said that after the shooting, he went over to his "play auntie's house." He said that an individual he knew by the moniker "JoJo" had placed the weapon in his car and came to his "play auntie's house" to retrieve the weapon after the shooting. The defendant claimed that he did not know "JoJo's" first or last name.

-4-

Despite Ms. Murphy's testimony to the contrary, the defendant denied asking her to communicate a threat to the victim. In addition, despite Ms. Dillard's testimony to the contrary, the defendant maintained that he did not display a weapon prior to the victim's arrival at his mother's house.

During cross-examination, the defendant denied that "JoJo" had brought the gun to him for the purpose of confronting the victim and attributed it's presence in his vehicle at the precise moment the victim arrived to happenstance. The defendant denied knowing the make and model of the weapon or even whether it was loaded when he retrieved it from the car. He said that he picked up his son and his "baby's mamma" from his "play auntie's house" and took them to his brother's house, where they all went to sleep for the night.

On this proof, the jury convicted the defendant of the lesser included offense of second degree murder. The trial court imposed a sentence of 23 years' incarceration. Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal in this court. In this appeal, he challenges the sufficiency of the convicting evidence, arguing that the evidence failed to rebut his affirmative defense of self-defense given "the disparities and contradictions in the testimony of the State's witnesses."

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1) (2006).

The defendant claims that, "when the disparities and contradictions in the testimony of the State's witnesses are examined," the evidence actually established that he was "not guilty by self[-]defense." Alternatively, he argues, "with all of the testimony relative to the arguing and yelling just prior to the shooting, the best the State could hope for is voluntary manslaughter." We remind the defendant, however, that this court is not free to reweigh the testimony presented at trial or substitute our own inferences for those drawn by the jury. *See Dorantes*, 331 S.W.3d at 379 (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008), and stating, "'The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'").

The evidence adduced at trial established that the defendant and the victim had a dispute over $50.00. Several witnesses testified that the defendant stated his intent to kill the victim as soon as he could procure a weapon, and Ms. Dillard confirmed that the defendant displayed a firearm and stated his intent to use the weapon to confront the victim. During the argument, the defendant took time to step away from the victim, return to his car, and arm himself with a handgun before aiming it directly at the victim. The defendant admitted that he shot the victim during their argument over the money. This evidence adequately supports the defendant's conviction of second degree murder. Although the defendant claimed that he shot the victim in self-defense and that, in any event, he did not intend to kill the victim, the jury, as the trier of fact, was free to reject this testimony.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE