IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2011

## STATE OF TENNESSEE v. ELLIS RANDALL DARNELL, JR.

**Direct Appeal from the Circuit Court for Marshall County**
**No. 09CR36     Robert Crigler, Judge**

**No. M2010-00975-CCA-R3-CD -Filed January 17, 2011**

The defendant, Ellis Randall Darnell, Jr., was convicted of one count of manufacturing one-half gram or more of methamphetamine, a Class B felony; one count of possession with intent to deliver one-half gram or more of methamphetamine, a Class B felony; and one count of possession of a firearm during the commission of a dangerous felony, a Class D felony. The defendant was sentenced as a Range I, standard offender to two concurrent nine-year terms for the methamphetamine convictions and to a consecutive four-year term for the firearm conviction, for a total effective sentence of thirteen years. On appeal, the defendant claims that the evidence is insufficient to support his conviction for possessing a firearm during the commission of a dangerous felony and that the trial court erred by ruling during a hearing concerning his motion for a new trial that a juror could not testify that other jurors engaged in intimidating conduct during the jury's deliberations. After carefully reviewing the record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Melissa L. Thomas, Fayetteville, Tennessee, for the appellant, Ellis Randall Darnell, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 21, 2009, the defendant and three other individuals were arrested after their vehicle was pulled over for speeding and officers of the Marshall County Sheriff's

Department discovered drugs and guns in their possession. On April 22, 2009, the defendant, along with two co-defendants, was indicted by the Marshall County Grand Jury for manufacturing more than one-half gram of methamphetamine (Count I) and possession with intent to deliver more than one-half gram of methamphetamine (Count II). The defendant was also separately charged with the possession of a firearm with the intent to go armed during the commission of a dangerous felony (Count III). The defendant's case was severed from that of his co-defendants, and he was tried by jury in the Marshall County Circuit Court on December 3, 2009. The following evidence was presented at his trial.

Mr. Jason Morgan, one of the four occupants of the vehicle that was pulled over on January 21, 2009, was the State's initial witness. Mr. Morgan testified that he had a criminal history that included numerous convictions for the possession of marijuana. He also testified that he had charges currently pending before the court arising from his participation in the activities that occurred on January 21, 2009, and that those charges were (1) manufacturing methamphetamine in an amount greater than 0.5 grams, (2) possession of methamphetamine in an amount greater than 0.5 grams with intent to deliver, and (3) possession of a firearm during the commission of a dangerous felony, *viz.*, the possession of methamphetamine with intent to deliver. Mr. Morgan further testified that he was, in fact, guilty of committing each of those crimes. Mr. Morgan asserted that he had been offered no deal by the State concerning his pending charges in exchange for the testimony that he was about to give.

Mr. Morgan testified that prior to January 21, 2009, he knew the defendant, another male named Chris Beard, and a female known as Kacy Cantrell. It was his understanding that Ms. Cantrell was Mr. Beard's girlfriend. Mr. Morgan testified that around 8:00 a.m. in the morning on January 20, 2009, he received a text message from the defendant inviting him to come over to the defendant's house, where he could meet with Mr. Beard and Ms. Cantrell to "cook breakfast." Mr. Morgan testified that he decided to do so and that when he left his house, he took with him a small quantity of methamphetamine as well as a rifle that he frequently used for nighttime deer hunting purposes.

Mr. Morgan testified that when he arrived at the defendant's residence, Mr. Beard and Ms. Cantrell were already there and that the four of them sat around the table cleaning various weapons, including a .38 caliber pistol belonging to the defendant. The State presented a .38 caliber pistol to Mr. Morgan, which he identified as belonging to the defendant and which he testified that the defendant had cleaned and carried with him throughout the day in question. This pistol was admitted into evidence.

According to Mr. Morgan's testimony, at approximately 6:30 or 7:00 p.m., the four individuals left the defendant's residence and drove in the defendant's Jeep Grand Cherokee to Lewisburg, Tennessee. Mr. Morgan testified that he brought his hunting rifle with him

and that the defendant brought his .38 pistol, as well as a .357 rifle (which the witness identified and which was also entered into evidence). An additional rifle was also brought by someone in the group – resulting in a total of four people and four guns in the vehicle traveling to Lewisburg.

Mr. Morgan testified that once the group arrived in Lewisburg, they immediately went to Walmart in order to buy Coleman liquid petroleum lamp fuel and Sudafed pills – two key ingredients used in the manufacture of methamphetamine. All four members of the group went inside the store. Mr. Morgan and Ms. Cantrell separated from each other, and each bought a single package of Sudafed pills. Separately, the defendant and Mr. Beard bought some Coleman fuel. After completing their respective purchases, Mr. Morgan testified that the group left Walmart and went to a stranger's house.

Mr. Morgan testified that he had never met the stranger who owned the house that was the group's destination that night, that he had no idea where it was located, and that he would have no idea how to return to that location because he was driven there by Mr. Beard. Mr. Morgan testified that once they arrived at the stranger's house, the group went into a "little party shack" located behind the main residence. There, the defendant and Mr. Beard began pulling items and ingredients off the shack's shelves and using them to manufacture methamphetamine. Mr. Morgan testified that the ingredients contained in the party shack that were used by the defendant and Mr. Beard in the drug manufacturing process included: a gas can with a rubber hose taped to it, lye, two liter jugs, electrical tape, coffee filters, and an old glass jar. The Coleman fuel and the crushed Sudafed pills that had been brought by the group were used in conjunction with these items to manufacture methamphetamine. Mr. Morgan proceeded to testify in considerable detail concerning the process that the defendant and Mr. Beard used to manufacture the methamphetamine in the party shack. Mr. Morgan testified that all the group's firearms remained in the Jeep Grand Cherokee during the manufacturing process.

Mr. Morgan testified that it was nearly 11:00 p.m. by the time the process was finished. The defendant and Mr. Beard took the materials used to manufacture the methamphetamine and placed them on a burn pile behind the shack. The two men then proceeded to set fire to the burn pile and incinerate all of the used equipment. During this process, the defendant made the statement, "no trash, no evidence." Thereafter, the defendant and Mr. Beard brought out a set of digital scales and measured out the methamphetamine. Mr. Morgan testified that he received one-half gram of the finished product in return for purchasing one box of the Sudafed pills and that the defendant and Mr. Beard split the remainder of the methamphetamine. It was his belief that Ms. Cantrell did not receive an amount of methamphetamine similar to his because her share was commingled with the amount kept by her boyfriend Mr. Beard.

At some point afterward, the owner of the house returned, and the group left. The group drove in the same vehicle to the defendant's house, where each member of the group snorted some methamphetamine, and Mr. Morgan and the defendant smoked methamphetamine as well. Mr. Morgan testified that the high he obtained from the methamphetamine lasted two to four hours and that he got "bad shakes" when it wore off. He further testified that he did not enjoy being physically addicted to the substance.

After cooking and consuming some deer meat, the four got back into the defendant's Jeep Grand Cherokee to go "spotlighting"[1] from the vehicle. Mr. Morgan testified that Mr. Beard drove the vehicle and that he was carrying some of the methamphetamine in his pocket while doing so. Mr. Morgan testified that the defendant also carried his firearm and some methamphetamine with him. Mr. Morgan testified that they traveled around for some time searching for deer and that Mr. Beard shot several of them with his rifle while Mr. Morgan operated a spotlight. However, they were unable to locate any of the deer carcasses. Finally, after Mr. Beard shot one particular deer with a rifle, the group was able to track it, and Mr. Morgan testified that the defendant finished it off by shooting it in the head at close range with his .38 special.

Mr. Morgan testified that, after placing the deer carcass in the back of the vehicle, the group left the property where they had been hunting by going around a gate and through a ditch, attracting the attention of a deputy sheriff who was patrolling nearby in the process. The deputy turned on his flashing lights and ordered the defendant's vehicle to pull over. At this time, according to Mr. Morgan's testimony, Ms. Cantrell asked Mr. Beard to give her all of the methamphetamine that was in his possession, and he did so.

When the deputy approached the car, Mr. Morgan was trying to unload his rifle. The deputy instructed the group to put their hands up where the deputy could see them. Mr. Morgan, however, continued to try to unload his rifle. The deputy told Mr. Morgan to put his hands on the back of the driver's side front seat. Other deputies began to arrive, and the group was ordered out of their vehicle. After Mr. Morgan was handcuffed and placed in a squad car, the police found a package of methamphetamine hidden inside his boot.

The group was arrested and taken back to the police station. A drug task force member, Officer Billy Ostermann, approached each individual of the group and attempted to get them to talk. Mr. Morgan testified that he spoke with Officer Ostermann that night at the police station.

---

[1] Spotlighting is the hunting of deer at night by shining a high-powered spotlight into the deer's eyes, causing the animal to freeze in its tracks.

-4-

On cross-examination, the defendant's counsel impeached Mr. Morgan's testimony with numerous inconsistent statements that he made to the police on the night that he was arrested. Mr. Morgan claimed on the stand to have lied to the police numerous times during his interrogation and in the signed statement he gave to them on January 21, 2009. Furthermore, Mr. Morgan admitted to participating in numerous other methamphetamine "cooks" led by Mr. Beard. However, Mr. Morgan asserted that his participation in those cooks was limited to the purchase of the Sudafed pills to be used during the cooking process. Mr. Morgan further testified that he was not planning on selling any of the methamphetamine in his possession on the night in question to anyone, and that, as far as he was aware, neither the defendant, Mr. Beard, nor Ms. Cantrell planned on selling or delivering any of the methamphetamine that they had in their possession to anyone else. Mr. Morgan testified that the methamphetamine that each one of them possessed that night was for their own personal use.

On redirect examination, the witness went into greater detail concerning his prior participation in methamphetamine "cooks" with Mr. Beard and the defendant. According to Mr. Morgan's testimony, he went to the defendant's house to "cook" methamphetamine at least twice a week over a period of five or six months. Mr. Morgan claimed that after the "cook" was finished on the night in question, the defendant "delivered" his portion of the methamphetamine to him after he and Mr. Beard measured it on the scales. Finally, Mr. Morgan testified that the defendant had other friends who used methamphetamine and that he was aware that the defendant had supplied those individuals with methamphetamine.

On re-cross examination, the witness stated that Mr. Beard was the principal methamphetamine "cook" and was effectively the leader of the group. The witness stated that it was his belief that it was unfair that the mastermind of the entire criminal operation, Mr. Beard, was not charged with any drug-related crime for the events that occurred on the night in question, while the other three members of the group faced serious criminal charges.

Following this testimony, Deputy Tony Nichols of the Marshall County Sheriff's Department took the stand. Deputy Nichols testified that in the early morning hours on the night in question, he was on routine patrol in a rural area of Marshall County. He was driving down Finley Beach Road when he observed a vehicle in a field with its headlights on. The deputy observed a spotlight coming from the vehicle. The deputy's attention was immediately attracted to this vehicle because the deputy was a deer hunter and was aware that it was illegal to hunt deer at night using a spotlight. The deputy drove past a locked gate running across a driveway leading into the field and continued past it before turning around to go back. The deputy observed the vehicle, which he identified as a red Jeep Grand Cherokee, come out of the field by driving through a ditch and avoiding the gate that closed off the driveway. The deputy attempted to catch up to the vehicle and observed the vehicle

traveling at least 60 to 65 miles per hour through an area where the posted legal speed limit was 45 miles per hour. Deputy Nichols decided to pull the vehicle over to investigate the speeding and potential spotlight hunting infractions.

The deputy testified that he approached the driver of the vehicle and informed him that he had stopped the vehicle for speeding. As he did so, he looked inside the vehicle and saw several weapons. One was a rifle located in the front passenger seat next to the defendant. A second rifle was located directly behind the front passenger seat, near where Ms. Cantrell was sitting in the back. The deputy also observed the second backseat passenger, Mr. Morgan, moving his hands rapidly. When the deputy asked Mr. Morgan what he was doing, Mr. Morgan replied, "I have a gun." At this point, Deputy Nichols ordered everyone to put their hands up and called for backup.

Deputies Lane Worsham and Matt Owens arrived. Deputy Nichols removed Mr. Morgan's rifle from the vehicle and discovered that it was loaded. The deputies then removed the driver, Mr. Beard, from the vehicle. They interrogated him for a few minutes and then charged him with driving under the influence because he appeared to be suffering from the effects of some sort of intoxicant. In addition, Mr. Beard was charged with hunting from a public road, possession of a deer carcass, hunting out of season, and spotlighting. No drugs of any kind were found on Mr. Beard.

Next, the deputies asked the defendant to get out of the vehicle. Deputy Nichols testified that, as he did so, he saw a handgun fall to the ground. The deputies seized this weapon, which was a fully loaded .38 caliber Smith & Wesson revolver. The deputies patted the defendant down, did not find anything suspicious, and placed him in a patrol car, preparing to arrest him for various hunting violations. Mr. Morgan was taken into custody in the same manner.

Finally, the deputies asked Ms. Cantrell to step out of the vehicle and requested her driver's license. She stated that it was in her purse and started back to the vehicle to retrieve it. Because of the weapons they had previously discovered, the deputies refused to let her return to the vehicle. Instead, Deputy Worsham reached inside and secured Ms. Cantrell's purse. Immediately upon opening it, Deputy Worsham saw a substance that appeared to be methamphetamine. Deputy Nichols testified that Deputy Worsham turned this substance over to him. Deputy Nichols identified the substance at trial, and it was entered into evidence.

Deputy Nichols testified that after finding what appeared to be methamphetamine in Ms. Cantrell's purse, he asked Deputy Owens to search the vehicle. During the ensuing search, Deputy Owens discovered a bottle containing some pills; a container with white

powder inside; a metal cigarette box with a white powdery residue; a pipe; and two pocket-knives and two straws, each covered in white residue. Deputy Nichols testified that Deputy Owens gave him each of those items. Deputy Nichols confronted the defendant about the items discovered in his vehicle, and the defendant claimed that all the "dope" found in the car belonged to him. These items were entered into evidence at trial.

In addition, the State entered into evidence two items that were found on the defendant during a further search of his person the night in question, according to the testimony of Deputy Nichols. These items included some pills that were in the defendant's pocket and an additional bag of methamphetamine that the defendant revealed he possessed after Deputy Nichols informed him that he might receive an additional charge if found to be in possession of any additional illegal substances after he was taken to jail. The State also entered into evidence an envelope containing some additional methamphetamine that had been found on Mr. Morgan, as well as a pipe Deputy Nichols identified as being one commonly used to smoke marijuana or methamphetamine.

Deputy Lane Worsham of the Marshall County Sheriff's Department testified that he responded to a call for backup from Deputy Nichols in the early morning hours on the night in question. Deputy Worsham stated that in the process of assisting Deputy Owens, he retrieved and opened a purse belonging to Ms. Cantrell for the purpose of obtaining her identification. In the process of doing so, he uncovered certain evidence (as described above) that he turned over to Deputy Nichols.

Thereafter, the State called Deputy Matt Owens of the Marshall County Sheriff's Department to the stand. Deputy Owens stated that on the night in question, he assisted Deputy Nichols and Deputy Worsham with the traffic stop of a Jeep Grand Cherokee. In the course of rendering assistance, he searched the defendant's vehicle and found certain items that he turned over to Deputy Nichols as evidence. Deputy Owens also corroborated certain portions of the testimony given by Deputy Nichols.

Next, the State called Captain Norman Dalton of the Marshall County Sheriff's Department, who testified concerning the police procedures used to (1) secure the evidence on the night in question, (2) send that evidence to the Tennessee Bureau of Investigation ("TBI") crime lab for analysis, and (3) store that evidence for trial once it had been analyzed and returned by the TBI.

The State then presented the testimony of Deputy Billy Ostermann of the Marshall County Sheriff's Department, who testified that he had significant training and experience in dealing with methamphetamine laboratories and production. Deputy Ostermann testified that methamphetamine is by far the most addictive substance that is generally prevalent in

the area. Deputy Ostermannn further testified that there are three different methods of manufacturing methamphetamine, and in light of the description given by Mr. Morgan, it was his opinion that the method the group had used to produce the methamphetamine was the "shake and bake" method. Deputy Ostermann testified that this method is extremely dangerous. Deputy Ostermann further testified that on the early morning hours of the night in question, he had spoken with Mr. Morgan concerning the group's methamphetamine-related activities and that Mr. Morgan had told him essentially the same story that night that he had told the jury on the stand.

On cross-examination, the defendant's counsel pointed out several discrepancies between the story Mr. Morgan told Deputy Ostermann on the night of his arrest and the testimony that he gave at trial, including the fact that Mr. Morgan had at one point stated that the methamphetamine was manufactured inside the building rather than outside of the building in a "party shack."

Sergeant James Derry of the Tennessee National Guard Counter Drug Task Force testified that pursuant to the Meth Free Tennessee Act of 2005, an individual's purchases of pseudoephedrine are limited to nine grams per month and that pharmacies must keep a computer registry of their sales of pseudoephedrine and ephedrine products. Sgt. Derry introduced into evidence a computer-generated purchase report concerning the defendant that had been compiled from various pharmacy registries throughout Tennessee. This purchase report covered the time period from July 29, 2008, to March 6, 2009, and showed that the defendant purchased a total of forty-three grams of pseudoephedrine on eighteen separate occasions during that time frame – the equivalent of approximately 900 pills.

Sgt. Derry also testified that the "shake and bake" method used to manufacture methamphetamine is extremely dangerous. Sgt. Derry cited studies showing that methamphetamine cooks have an average of ten fires before they either burn their house down or get arrested. In addition, the methamphetamine manufacturing process sends toxic chemicals throughout the house, where they are soaked into the drywall and carpet. Severe remediation is required to return any house used to manufacture methamphetamine to a habitable state.

Ms. Jennifer Sullivan, a chemist with the Tennessee Bureau of Investigation, was qualified as an expert in forensic chemistry. She testified that she examined several pieces of evidence in relation to the case and tested those pieces of evidence to identify the nature and amount of the substance contained therein. She explained that prohibited substances are labeled as Schedule I-VIII under the Tennessee Drug Control Act. In general, the lower a particular drug's schedule number, the greater the seriousness of the danger to public health posed by the drug.

Ms. Sullivan testified that after performing the necessary tests, she determined that a bag represented to her as coming from Mr. Jason Morgan contained .08 grams of methamphetamine, a Schedule II controlled substance. Her report concerning her analysis of this substance was entered into evidence without objection. Ms. Sullivan also testified that she tested three materials represented to her as coming from Ms. Cantrell. The first item was a bottle containing 2.25 pills, which her testing revealed was Alprazolam (commonly known as Xanax), a Schedule IV controlled substance. The second item was a bag containing a white powder, which her testing identified as 2.2 grams of methamphetamine. The third item was also a bag containing a white powder, which her testing identified as 0.2 grams of methamphetamine. Her report concerning these matters was entered into evidence without objection. Finally, Ms. Sullivan discussed testing she had done concerning two items represented to her as coming from the defendant. According to her analysis, the first item was a packet containing 1.5 tablets of Xanax and the second was a packet containing 1.4 grams of methamphetamine. The witness's lab report concerning these materials was entered into evidence without objection. Ms. Sullivan testified that the total amount of methamphetamine contained in all three envelopes was 3.88 grams.

Following this testimony, the State rested. The defendant moved for a judgment of acquittal on Count II and Count III of the indictment on sufficiency of the evidence grounds, but this motion was denied. Thereafter, the trial court advised the defendant of his right to testify in his own defense, and the defendant waived that right pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999).

The defense called as a witness Officer Doug Lowrey of the Tennessee Wildlife Resources Department. Officer Lowrey testified that he arrived at the traffic stop made by Deputy Nichols in the early morning hours of January 21, 2009. While there, he found a deer carcass in a plastic tub in the rear of the vehicle. In his opinion, the deer had been killed recently, as *rigor mortis* had not yet set in. Officer Lowery also testified that he had been present when the defendant pled guilty to various misdemeanor charges stemming from his conduct on the night in question, including spotlighting deer, illegal hunting from the road, and other hunting-related charges. Officer Lowery further testified that the defendant had forfeited his Jeep Grand Cherokee as a result of the incident. Following this testimony, the defense rested.

Both parties gave their closing arguments, and the jury was duly instructed. The jury began deliberating at 8:44 p.m. that evening and returned with a verdict of guilty on all counts at 11:04 p.m. that same night.

A sentencing hearing was held on January 20, 2010. The trial court found that the defendant was a Range I, standard offender and that the applicable sentencing range for his

two Class B drug-related felonies was eight to twelve years. Given the defendant's status as a Range I offender, his applicable sentencing range for a Class D felony conviction would normally have been two to four years. However, because of the defendant's decision to go armed during the commission of a dangerous felony, the special provisions contained in Tennessee Code Annotated sections 39-17-1324(e)(1) and 39-17-1324(g)(1) required the trial court to impose at least a three-year mandatory minimum sentence with respect to that conviction, and required that any sentence that the trial court imposed on that count be served consecutively to any sentence imposed on his underlying convictions.

The trial court then considered the various enhancement factors and mitigating factors put forward by the two sides. As an enhancement factor, the trial court found that the defendant had a history of criminal behavior in addition to the criminal convictions necessary to establish his offender range. Tennessee Code Annotated § 40-35-114(1) (2010). Specifically, the trial court noted that the defendant had admitted in his presentence report that he had used marijuana and cocaine – later switching from cocaine to methamphetamine for financial reasons – on a consistent basis for many years. The trial court also rejected the defendant's argument that it should consider as a mitigating factor the fact that his conduct neither caused nor threatened serious bodily injury. The trial court reasoned that a traffic stop, conducted by a lone officer in a remote area in the dead of night, of a vehicle containing four individuals possessing both guns and drugs was a situation that carried with it an appreciable threat of serious bodily injury to one or more of the involved parties.

The trial court found that there was a single enhancing factor and no mitigating factors. With that factor and other appropriate sentencing principles in mind, the trial court sentenced the defendant to nine years in the Tennessee Department of Correction on Count I, the manufacture of methamphetamine in an amount exceeding half a gram, and to a concurrent nine-year term in the Department of Correction on Count II, the possession with intent to deliver methamphetamine in an amount exceeding half a gram. On Count III, the possession of a firearm during the commission of or attempt to commit a dangerous felony, the trial court set the defendant's sentence at four years. Because the defendant's sentence on Count III was required by statute to run consecutively to his sentence on Count II, the defendant's total effective sentence was thirteen years.

A motion for new trial was promptly filed, and the trial court held a hearing on the matter on April 7, 2010. The defendant's first argument was that the evidence was insufficient to support his convictions. The defendant's second argument was that the defendant's right to a fair trial had been prejudiced by juror misconduct occurring throughout the trial and during the jury's deliberations. At this hearing, the defendant sought to have one juror testify that during the jury's deliberations she was intimidated by the other jurors and that the jury improperly discussed the defendant's case prior to deliberations during

courtroom breaks.  However, the trial court relied upon Tennessee Rule of Evidence 606(b) to forbid the defense from asking the juror-witness any questions concerning the content of the jury's deliberations or their mental processes.  The trial court ruled that juror questioning would be limited to the allegation that the jury discussed the case during courtroom breaks.

Following this ruling, the defendant called a former juror, who testified that she had served on the jury during the defendant's trial.  She testified that the jury received instructions not to discuss the trial during the break.  She also testified that during every break, all the jurors engaged in extended commentary concerning what was going on during the trial.

On cross-examination, the State sought to examine the precise nature and extent of the jury's discussion of the case during the various breaks. During the course of this cross-examination, the witness testified in far greater detail concerning the vast number of discussions that occurred and the content of those discussions.  The former juror testified that the discussions involved matters crucial to the case, such as the credibility of individual witnesses.  The juror also testified that the discussions during these breaks often became very heated as individual jurors argued over the evidence and the defendant's guilt.  The juror testified that these heated discussions occurred during every courtroom break, notwithstanding the fact that the jury was receiving continuous instructions from various court personnel to the effect that all such conversations should cease.

The State called as a witness Mr. Duane Haislip, a court officer who was one of several court officers on duty during the defendant's trial.  Mr. Haislip testified that he never chastised any juror for discussing the case during courtroom breaks and that, had any juror engaged in any improper discussion, he would have promptly reported the matter to the court.

Following this testimony, the defense moved that the verdict in the case be set aside and that the defendant be granted a new trial based on the fact that the jury failed to follow the court's instructions not to discuss the case during breaks during the trial.  The trial court denied the defendant's motion for new trial at the end of the hearing and filed a written order denying the motion.  This appeal followed.

**ANALYSIS**

The defendant contends that the evidence was insufficient as a matter of law for a reasonable jury to find him guilty of the offense of possessing a firearm during the commission or attempt to commit a dangerous felony.  The defendant further contends that the trial court erred in ruling that a juror that the defendant had called as a witness during his motion for a new trial could not testify concerning alleged intimidating conduct committed

by other jurors during deliberations. For the reasons that follow, we reject both claims.

## I.

The defendant contends that the evidence adduced at trial was insufficient to convince any rational trier of fact that he was guilty of possessing a firearm during the commission of a dangerous felony. Specifically, the defendant contends that the State failed to prove that he possessed firearms for the purpose of delivering methamphetamine rather than merely spotlighting and killing deer. We disagree.

"'Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict.'" *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In deciding whether or not a defendant has carried this burden, we examine all the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found the essential elements of the crime in question beyond a reasonable doubt. *See id.*

In this case, the essential elements of the crime in question are those of Tennessee Code Annotated section 39-17-1324(a), which states that "[i]t is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." The statute further defines dangerous felonies as including "[a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance." T.C.A. §39-17-1324(i)(1)(L) (2009). Therefore, the key question before us is whether the State sufficiently established that this defendant possessed his guns with the intent to be armed while distributing methamphetamine, as charged in the indictment.

While much of the limited amount of direct testimony bearing on this issue adduced at the defendant's trial – including the testimony of the State's lead witness, Mr. Morgan – supports the defendant's interpretation of the evidence (that the defendant armed himself that day solely for the purpose of hunting and that all of the methamphetamine in his possession on that day was solely for his personal use), direct testimony is not the only method of establishing a criminal offense. The elements of a criminal offense may also be established by circumstantial evidence. *See, e.g.*, *Sisk*, 343 S.W.3d at 65 ("A criminal offense may, of course, be established exclusively by circumstantial evidence."); *Hanson*, 279 S.W.3d at 275 ("In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.").

Here, circumstantial evidence abounds in the record to support the jury's conclusion that this defendant was carrying a firearm for purposes of arming himself while he distributed methamphetamine. The defendant was found carrying an amount of methamphetamine from which a jury could reasonably infer his intent to distribute. The defendant was found not only to be in possession of a rifle, but also of a Smith & Wesson pistol, an item whose usefulness in the nighttime hunting of deer is dubious at best (Mr. Morgan's testimony that immediately prior to the group's arrest the defendant had used his .38 revolver to "finish off" a wounded deer conflicting with testimony from Deputy Nichols, who stated that the revolver was fully loaded when the defendant dropped it on the ground). Records introduced by the State established that the defendant purchased more than 900 Sudafed pills in a nine-month period, and Mr. Morgan also testified that the defendant "cooked" methamphetamine at least twice a week and often distributed the finished product to individuals he knew who used the drug. From this and other circumstantial evidence, a reasonable jury could have reached the conclusion that the defendant was not only a user, but also a supplier, of methamphetamine and that all of his firearm-related activities on the evening in question were directed at least in part toward furthering that purpose.

This jury's conclusion that this defendant armed himself for the purpose of distributing methamphetamine does not necessarily conflict with the direct testimony of other witnesses to the effect that the defendant was also using firearms to "spotlight" deer. There is absolutely nothing appearing in this record that would prevent a reasonable jury from reaching the conclusion that the defendant carried his firearms that evening in order to serve both purposes – hunting deer and distributing drugs. However, even if the State's largely circumstantial case concerning this particular crime had conflicted with the direct testimony of one or more of the trial witnesses in various ways, the jury remained free to discount any portion of the testimony of those witnesses if the jury – serving in its fact-finder capacity – found them to be less than credible, *see, e.g.*, *Hanson,* 279 S.W.3d at 274-79*; State v. Campbell*, 245 S.W.3d 331, 335-36 (Tenn. 2008), and after discrediting any contrary direct testimony, the jury was free to reach an opposing conclusion, even if this conclusion was established solely by circumstantial evidence. As the Tennessee Supreme Court has made clear, cases built solely on circumstantial evidence are no longer to be placed on an inferior footing to those established by direct evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) (observing that "federal courts of appeal have followed the Supreme Court's directive, consistently holding that direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence" and holding that "[w]e specifically adopt the standard enunciated by the United States Supreme Court as applicable to prosecutions in this state"). Our standard of review "is the same whether [a] conviction is based upon direct or circumstantial evidence," or a combination of both. *Hanson*, 279 S.W.3d at 275 (internal quotations omitted)). Whether a jury's inferences are drawn from direct or circumstantial evidence, we may not substitute our own inferences for theirs on

appeal. *See id.*

In this case, a rational jury was free to infer from the amount of methamphetamine found on the defendant, the fact that he was also found carrying a fully loaded handgun, and numerous other circumstantial facts – in addition to the direct testimony concerning his prior history of participating in methamphetamine cooks and delivering the finished product to others – that, on the night in question, this defendant armed himself for purposes of assisting in the distribution of a significant quantity of methamphetamine, a dangerous felony. Accordingly, the defendant's challenge to the sufficiency of the evidence is denied.

**II.**

The defendant's second argument – that the trial court erred by ruling that a juror could not testify at a hearing on his motion for a new trial concerning intimidating conduct committed by certain jurors during deliberations – is somewhat unusual in that the defendant acknowledges that Tennessee Rule of Evidence 606(b) forbids inquiry into the validity of a verdict. The defendant "readily concedes that th[is] [is] well settled law." Rule 606(b) states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The defendant does not argue that his proposed line of questioning concerning the alleged intimidating conduct committed by some of the jurors during deliberations falls into any of the categories exempted by Rule 606(b). Rather, the defendant argues that the jurors who sit on cases in this state likely "can and do make threatening gestures and statements to those who disagree with them during deliberations," that "this behavior has become tolerated by society and encouraged by the media," and that existing law must be updated to account for this type of decline in our civilization.

This court must decline the defendant's invitation to "carv[e] out an exception" for "threatening behavior from one juror to another during deliberations" or to otherwise alter or amend a Rules of Evidence duly adopted by the Tennessee Supreme Court (and even more so the defendant's invitation to apply such a change retroactively to his benefit). "Only the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state." *State v. Mallard*, 40 S.W.3d 473, 480-481 (Tenn. 2001). Consequently, we presume the defendant makes this argument solely for purposes of preserving it for consideration by that exalted body. That purpose having been accomplished to the extent feasible with respect to this tribunal, the defendant's claim that the trial court erred by ruling that a juror could not testify concerning intimidating conduct during deliberations is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE