# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. THEOTUS BARNETT

**Appeal from the Criminal Court for Shelby County**
**No. 11-00038    James C. Beasley, Judge**

---

**No. W2012-00048-CCA-R3-CD  - Filed May 22, 2013**

---

The defendant was convicted of especially aggravated kidnapping, a Class A felony, and aggravated robbery, a Class B felony.  He was sentenced to twenty-five years for the kidnapping conviction and to a consecutive ten years for the aggravated robbery, for a total effective sentence of thirty-five years.  On appeal, the defendant claims that: 1) the evidence is insufficient to support his conviction; 2) the trial court erred by failing to apply a mitigating factor at sentencing; and 3) the trial court erred by imposing consecutive sentences.  After a careful review of the record, we find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Stephen Bush, District Public Defender; and Barry Kuhn, Assistant Public Defender, Memphis, Tennessee, (on appeal); and Rusty White, Assistant Public Defender, Memphis, Tennessee, (at trial), for the appellant, Theotus Barnett.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Flemming and Kirby May, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

On January 1, 2011, the defendant, Theotus Barnett, was indicted on one count of especially aggravated kidnapping in violation of Tennessee Code Annotated section 39-13-305 and one count of aggravated robbery in violation of Tennessee Code Annotated section 39-13-402. The charges against the defendant resulted from an incident that occurred at a U-Store-It facility on September 11, 2010. At the defendant's trial on September 19-21, 2011, the State presented the testimony of five witnesses.

The victim, Ashley Rankin, testified that on September 11, 2010, she was working alone at a U-Store-It facility located on Austin Peay Highway in Shelby County. She testified that she was eight months pregnant at the time. She testified that between 9:30 a.m. and 10:30 a.m. that morning, the defendant (whom she identified in open court) entered the facility indicating that he was a potential client. He looked at several storage units. Ms. Rankin testified that the defendant was wearing a blue baseball cap with a star logo in the middle, a pale blue button-down shirt, and blue jeans. She testified that after he finished looking at the storage units, she wrote down the various prices for him. The defendant told her that he would make a decision that afternoon and perhaps return later in the day.

The victim testified that the defendant returned to the facility around 12:30 p.m. and asked to see one of the storage units again. She took the defendant to look at the unit again. As they were re-entering the office, the defendant placed her in a choke hold. The victim testified that she panicked and began to struggle, at which point the defendant started punching her. She testified that the defendant pulled her to the floor and repeatedly hit her in the face. The defendant also told her that he could shoot her and "nobody would hear a thing." The victim testified that she eventually ceased struggling out of fear for the safety of her unborn child.

The victim testified that the defendant instructed her to go sit in a chair in a nearby break room. Once there, the defendant asked her about the money in the facility's cash register, and they walked to the front together and retrieved the cash before returning to the break room. The defendant then began to interrogate the victim concerning accounts with the company. The victim informed him that she could not access client accounts. The victim testified that the defendant started asking her about the facility's surveillance system, and they again walked to the front office, where she turned off all of the cameras at the defendant's request. The victim testified that the defendant demanded to see her identification, and she walked back to the break room, retrieved her purse, and gave him an unspecified identification card belonging to her.

-2-

The victim testified that the defendant instructed her to sit back down in the chair in the break room. The victim surmised that some customers had just arrived. The defendant informed her that "they're not leaving," and the victim informed him that "usually they will leave after a few minutes if they don't see anybody coming out front." However, the customers did not leave. Instead, they walked around the building and knocked on the doors and windows.

The victim testified that the defendant began to hit her in the head again, and then he hit her in the back with the point of his gun, knocking her to the ground. The defendant then threatened to kill her, and told her that he had her identification and that he knew where she lived. The defendant told her that if she said anything to anyone concerning the robbery, he would kill her and her whole family. The victim testified that the defendant hit her in the head with his gun a total of eight times. The victim testified that the defendant abruptly stopped hitting her in the head and pulled out a knife and held it to her neck. She testified that she told the defendant "after you've done all this . . . now you're going to cut me," and the defendant put the knife away.

The victim testified that she told the defendant that the customers were not going to leave unless someone went outside to service them. She testified that she instructed the defendant concerning how to access the facility's computer system and look up client accounts. She testified that the defendant asked her if there was any blood on him, and she told him "no." She testified that the defendant went to the front of the store. The victim testified that she did not call out for help because the defendant had told her that if she did so, he would shoot the customers and then return and shoot her. The victim testified that the defendant returned after approximately five minutes and instructed her to give a fake description and license tag number to the police. She testified that the defendant told her that if she failed to do so, he had a partner who would know where she lived and where she worked and would "get" her. The defendant then placed the victim's cell phone down on a table and told her to give him twenty minutes to escape.

The victim testified that the minute that she was sure that the defendant was gone, she locked the doors to the office. Then she pressed the facility's panic button and turned the surveillance cameras back on. She testified that she realized that the police would need to be able to enter the building in order to assist her, so she unlocked the front doors and then collapsed. Someone entered the room shortly afterward, raised her up, and told her that he was calling 911. She testified that the police arrived sometime afterward, but she could not remember much of what happened next due to her trauma. The victim testified that she was transported by ambulance to the hospital. She testified that she was treated for six or seven lacerations to the head which required "a lot of stitching" to close.

-3-

The victim testified that the entire incident lasted from one to two hours. The victim testified that only five minutes elapsed between the time that the defendant placed her in a choke hold and the time that she gave the defendant the money from the cash register. The victim estimated that five to ten minutes passed between the time that the defendant took the money from the register to the time that the customers first arrived. The victim estimated that only two or three minutes passed between the time the defendant left the facility and the time that someone came in to assist her.

The victim testified that two days after the incident, the police came to her house and showed her a photographic array. She testified that she identified the defendant as her attacker from this array, which was entered into evidence.

On cross-examination, the victim testified that she was seeing a psychiatrist concerning her memory loss due to post-traumatic stress disorder. The victim also admitted that she could not testify for certain concerning the amount of time that passed during the incident. The victim testified that she might have been knocked unconscious for periods of time by one or more of the defendant's blows. The victim testified that the defendant wore a hat and sunglasses throughout the incident. The victim denied that the police had shown her a single photograph of the defendant before they showed her the photographic array containing his picture.

Ms. Sherita Douglas testified that she went to the U-Store-It facility on Austin Peay on September 11, 2010, to pay a bill on a storage unit that her mother had rented there. She testified that she arrived at the facility between 12:00 p.m. and 12:30 p.m., with her two children in tow. She testified that she had been to this particular facility on prior occasions to pay her mother's bills. When she arrived and found that the front door to the office was locked, she waited outside because she knew from past experience that an employee might arrive to unlock the door if she waited for a few minutes. She testified that after waiting about ten minutes, she called her mother to confirm that the facility ought to be open, and then she walked around the building, knocking on its doors and windows. She testified that she saw a gold Tahoe or Yukon model SUV in the parking lot near the office as well as another vehicle parked further away.

Ms. Douglas testified that after she had been at the facility for twenty-five or thirty minutes, she set off her car alarm in an effort to attract an employee. About five minutes after she set off the alarm, another car pulled into the parking lot, and a gentleman and his son got out. She asked them if they worked at the facility, and they informed her that they did not. The new arrival also circled the building knocking on doors and windows. Afterward, the man and his son slipped through a gate and searched the facility's lot. By the

time they returned from this fruitless endeavor, an hour had passed since Ms. Douglas had arrived at the facility.

Ms. Douglas testified that she became concerned that something unusual was happening and called the police. She informed the police that she was not sure that "anything was going wrong," but that she was "very concerned" because she had been outside of the facility for an extended period and no one had arrived. Ms. Douglas testified that shortly after she placed her call to the police another gentleman "came and opened the door and he fanned us in." She testified that this individual was wearing a Dallas Cowboys' hat, a blue shirt, and blue jeans. She testified that this individual appeared to be nervous. The individual informed her that he had been sick and had been suffering from diarrhea all day, and he explained that he had not heard anyone at the door.

Ms. Douglas entered the building with her children. Ms. Douglas testified that she was not able to pay her mother's bill because the individual who had let her in was not able to pull up her account. She testified that she noticed blood on this individual's right hand and informed him that he was bleeding. She testified that she became convinced that something was "not right," and she tried to get the attention of the male customer to draw his attention to the individual's wound. Ms. Douglas testified that she told the individual that she needed to call her mother because the amount owed on her account was not right, and he told her to go outside to get better reception. However, she did not leave because she did not want to leave her children alone in the building with the stranger. Eventually, she found an opportunity to have a private conversation with the other customer, and they discussed the blood they saw on the individual behind the counter. She told the other customer she was going to go get her children and call the police. She spoke with the man behind the counter again, who told her to come back in an hour when his supervisor would be there and he would be able to help her. She left the building, drove across the street, and called the police.

Ms. Douglas testified that three or four minutes after she left, the man behind the counter left the building, got into the gold-colored Tahoe or Yukon SUV, and drove away at a speed well in excess of sixty-five miles per hour. She testified that she wrote down the license tag number of the SUV. From the stand, she identified the defendant as the man she saw behind the counter and driving the SUV.

Ms. Douglas testified that after the defendant left the storage facility, she returned to the building and waited for the police to arrive. She did not re-enter the facility. She spoke with police at the scene. Ms. Douglas testified that on September 13, 2010, the police showed her a photographic array at her home. She testified that she identified the defendant from this photographic array, which was entered into evidence.

On cross-examination, Ms. Douglas testified that she was inside of the facility with the defendant for a total of five or six minutes. She testified that the defendant wore a hat and sunglasses the entire time. She also denied that the police had shown her a single shot photograph of the defendant prior to the time that they showed her the photographic array. She testified that she was very certain of her identification of the defendant because she was extremely concerned and nervous during the long minutes that she and her children spent in the room with him. She testified that sunlight was entering the room from the outside and that this light allowed her to see the shape of the defendant's eyes and the fact that he had a scar under one eye. After her testimony was completed, the court permitted the defendant to stand in front of the jury for inspection to determine whether or not he had a scar under one eye.

Mr. Anthony Boyd testified that on September 11, 2010, he and his son went to the U-Store-It facility on Austin Peay Highway to rent a storage unit. When they arrived, there were three individuals trying to get inside the facility to make a payment on a storage unit. He testified that he walked around the facility twice in a fruitless attempt to gain entry. He testified that the "young lady" in front informed him that she was concerned that something was wrong. The young lady also pointed out that there was a car parked in the back of the parking lot where the employees normally parked. Mr. Boyd testified that he also saw a gold-toned Yukon SUV parked in front of the building. As he and his son went to walk around the building for a third time, the young lady yelled to him that someone was inside, and they entered the building.

Mr. Boyd testified that once inside, he overheard the conversation between the young lady and the gentleman who had let them in. The gentleman was explaining to the young lady that he could not access the facility's computer system because the female employee on duty had taken ill, and he had just taken her to the hospital. He testified that while the man was attempting to access the computer, he noticed "blood droppings" on the man's pants. He also noticed that the young lady was trying to signal to him under the counter. He suggested that the young lady go outside to call her mother to determine the amount owed on the unit. He caught the woman and they briefly conversed about the blood that they saw on the man behind the counter. He told the woman to leave and call the police, and he went to the counter and started asking the man questions about a storage unit.

Mr. Boyd identified the defendant in open court as the man behind the counter that day. He testified that the defendant was wearing a wrinkled hat and a wrinkled blue jean shirt. He testified that he spoke with the defendant for several minutes, and during that time the defendant's story kept changing. At first, the defendant claimed that he had diarrhea. Later, he claimed that the young lady who worked there had become sick and had been rushed to the hospital. The defendant first claimed that the girl's boyfriend would return so

that he could leave, and he later indicated that he was waiting for someone else. Mr. Boyd testified that the scene continued until "it was just getting a little crazy." He testified that he eventually told the defendant that he would just return on Monday.

Mr. Boyd testified that he followed the young lady across the street to watch what would happen. The defendant emerged from the facility less than two minutes later. Mr. Boyd told the young lady to call 911, and then he went back to the facility. As he returned, the defendant appeared to panic and sped away. Mr. Boyd testified that he followed the defendant long enough to obtain his vehicle license tag number.

Mr. Boyd testified that he returned and re-entered the building. He saw the victim raise her bloody head over the counter and ask for help. He testified that victim had dried blood all over her head and appeared to have been injured "for quite a while." He testified that the victim passed out after requesting assistance.

Mr. Boyd testified that he gave a statement to the police when they arrived. He also gave the police the license tag number of the gold-colored SUV. He testified that the police showed him a photographic array later that day, but the array that he was shown did not contain a picture of the perpetrator, and he informed the police of this fact. He testified that the police showed him a second photographic array sometime later, and he identified the defendant as the perpetrator from that second array, which was entered into evidence. Mr. Boyd testified that he was "100 percent" certain that he had correctly identified the perpetrator from the second photographic array.

On cross-examination, Mr. Boyd testified that he was positive that he was at the facility for a total of an hour and a half on the day in question. Mr. Boyd testified that he never saw the individual behind the counter without his sunglasses or a hat on. Mr. Boyd was also cross-examined extensively concerning his prior statement to police, in which he mentioned that the defendant had claimed to have had diarrhea on the day in question but did not mention that the defendant "kept changing his story."

Following this testimony, the defendant's ex-girlfriend, Ms. Sharon Mayhue, testified that in September of 2010 she drove a 2004 Chevy Tahoe. She testified that the papers listed the SUV as silver, but it was actually a "shimmery" color that appeared to be gold. She testified that on September 11, 2010, she drove her vehicle to the grocery store approximately 10:00 a.m. or 11:00 a.m. and returned home about half-an-hour to an hour later. She testified that her vehicle had last been cleaned two or three weeks previously and that the car was in "junkie" condition. She testified that she noticed that her vehicle's license tag was missing when she returned home with her groceries. Ms. Mayhew testified that the police came to visit her two days later and asked her questions about her vehicle.

Officer Terry Johnson of the Memphis Police Department testified that he was one of the first responders to the scene of the incident. He testified that he arrived at the storage facility around 1:30 p.m. and that he discovered Ms. Douglas and Mr. Boyd at the scene speaking to another officer. He testified that he entered the front building and discovered the victim lying on the floor in a puddle of blood. He testified that another room located down the hallway "had blood all over everything, on the floor and walls." He testified that the victim was lapsing in and out of consciousness and that she had so much blood on her head that it was impossible to see her wounds. Officer Johnson testified that he secured the crime scene, and after the paramedics arrived, he interviewed the witnesses.

Following this testimony, the victim's medical records were entered into evidence by stipulation of the parties. In addition, the parties stipulated that the security video system at the U-Store-It was not operating from 12:40 p.m. to 1:38 p.m.

Sergeant James A. Taylor, a Memphis Police Officer assigned to the Federal Bureau of Investigation (FBI) violent crime task force, testified that he investigated the crimes that occurred at a U-Store-It on Austin Peay Highway on September 11, 2010. Sergeant Taylor testified that, as the assigned case officer, he was responsible for handling the case "from the cradle to the grave." Sergeant Taylor testified that he interviewed the witnesses and received the license tag number of a vehicle that was seen leaving the scene. Sergeant Taylor testified that after running that tag number he discovered that an individual named "Reggie Price" had once received a ticket while driving that vehicle. He showed a photographic array containing Mr. Price's picture to one of the witnesses, but the witness did not identify Mr. Price as the perpetrator. After further research, Sergeant Taylor determined that the car at issue was registered to an individual named "Ms. Sharon Mayhue." He interviewed Ms. Mayhue, who informed him that she owned the vehicle at issue and that she had parked it on Friday, September 10, 2010, and did not return to it until the following Sunday, when she took it to Walmart to get some groceries and discovered that the license plate was missing. Sergeant Taylor testified that he asked for Ms. Mayhue's permission to search the car, and she consented.

Sergeant Taylor testified that the vehicle appeared to have been recently detailed; its seats were still slick with Armor All and its running boards had a "silicone" shine. Sergeant Taylor testified that the vehicle was extremely clean inside and out. Sergeant Taylor testified that he asked Ms. Mayhue if anyone else had access to her vehicle, and she replied that the defendant, "her ex-boyfriend of the past six days," also had access.

Sergeant Taylor testified that he prepared a photographic array containing the defendant's picture and showed it to the victim and the other witnesses. He testified that the victim identified the defendant as the perpetrator, and the other witnesses identified the

defendant as the individual they saw at the crime scene. He testified that an arrest warrant for the defendant was issued, and the defendant was arrested on September 17, 2011.

Sergeant Taylor testified that he interviewed the defendant following his arrest. After being advised of and waiving his *Miranda* rights, the defendant gave a statement, in which he acknowledged robbing the victim at the time and place in question. The defendant stated that no one else had participated in the robbery. The defendant stated that he was wearing a black hat with a star, a light blue shirt, and blue jeans during the robbery, and he was carrying a .32 caliber handgun loaded with two bullets. The defendant claimed that he had stolen approximately $300.00. Sergeant Taylor authenticated the defendant's statement from the stand, and it was entered into evidence.

On cross-examination, Sergeant Taylor testified that there was no audio or video recording of the defendant's statement. Sergeant Taylor testified that he did not request any DNA testing of the blood found at the crime scene because he felt that such testing would be a waste of money in light of the defendant's confession. Sergeant Taylor acknowledged that he had shown a picture of the defendant to Ms. Mayhue and that Ms. Mayhue had claimed that the individual depicted was not the defendant. Sergeant Taylor denied that he ever told Ms. Mayhue that he would charge her as an accessory if she did not sign any papers that he put in front of her.

Following this testimony, the State rested. The defendant was advised of and waived his right to testify in his own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). The jury returned a verdict finding the defendant guilty as charged. The defendant was sentenced to twenty-five years as a Range I, violent offender for the especially aggravated kidnapping conviction and to ten years as a Range I, standard offender for the aggravated robbery. Finding that the defendant was a dangerous offender who had no hesitation about committing a crime where the risk to human life was high, the trial court ordered the defendant to serve his sentences consecutively, for an overall effective sentence of thirty-five years.

The defendant filed a timely motion for new trial, the trial court denied the motion, and a timely notice of appeal was filed. Satisfied that the matter is properly before this court for review, we proceed to consider the defendant's claims.

**ANALYSIS**

The defendant claims that the evidence is insufficient to support his convictions for especially aggravated kidnapping and aggravated robbery. The defendant also claims that the trial court erred by failing to apply a statutory mitigating factor at sentencing and by

sentencing him to consecutive sentences. For the reasons that follow, we deny the defendant's claims for relief and affirm the judgments of the trial court.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his convictions for especially aggravated kidnapping and aggravated robbery. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). In assessing whether the defendant has carried this burden, we afford the State the strongest legitimate view of the evidence. *See id.* All reasonable and legitimate inferences that may be drawn from the evidence are drawn in favor of the State. *See id.* "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008). A reviewing court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297.

The defendant in this case challenges his convictions for especially aggravated kidnapping and aggravated robbery. As relevant to the charges in the indictment, "[e]specially aggravated kidnapping is false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-305 (a)(1) (2010). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. Robbery is aggravated if it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1).

The victim's direct testimony contains all of the evidence necessary for a reasonable jury to have found the essential elements of both crimes beyond a reasonable doubt. The victim testified that on September 11, 2010, the defendant entered her place of employment and assaulted her from behind. The victim testified that the defendant threatened to shoot her with a gun and that she feared for her life and for the life of her unborn child. The victim testified that the defendant demanded money from the facility's cash register, and she gave

the money to him. The victim testified that afterward, the defendant ordered her to go into another room and again assaulted her by hitting her with his fists and with a firearm. The victim testified that the defendant continued to keep her in that room for approximately ten additional minutes until some customers arrived. The victim testified that after the customers arrived, the defendant left her alone in the room but told her that if she attempted to seek help, he would shoot both her and the customers. The victim testified that after the customers left, the defendant continued to imprison her long enough to threaten her life and the lives of her family if she did not provide police with a false description of the perpetrator and a false license tag number.

With respect to the defendant's conviction for especially aggravated kidnapping, viewed in the light most favorable to the State, this testimony standing alone provides a sufficient basis for a reasonable jury to have found beyond a reasonable doubt that the defendant knowingly interfered with the victim's liberty (by moving her back and forth between the front office and break room of the U-Store-It facility and by preventing her from leaving the facility) and that he accomplished this task using a deadly weapon, a firearm. With respect to the defendant's aggravated robbery conviction, the victim's testimony standing alone likewise provides a sufficient basis for a reasonable jury to have found beyond a reasonable doubt that the defendant committed theft (by stealing $300.00 from the store's cash register), that he committed the theft by employing means of violence (choking, hitting, and striking the victim with a gun) and/or placing the victim in fear (by threatening her life and the life of her unborn child), and that he accomplished these tasks by using a deadly weapon (the aforementioned firearm). Although it is not critical to our decision, we further note that the victim's testimony concerning the essential elements of both crimes is supported in varying degrees by: 1) the store's surveillance system, which was offline for a period of time generally corroborative of the victim's testimony; 2) the testimony of eyewitnesses, who placed the defendant at the crime scene during the time period in question, saw blood on his body and clothes, and saw the wounded victim plead for help after he left; and 3) the written confession that the defendant subsequently provided to the police. The defendant is not entitled to relief on his claim that the evidence is insufficient to support his convictions.

In his reply brief, the defendant also seeks to raise a claim that the trial court erred by failing to properly instruct the jury. The defendant's sufficiency argument in his initial brief cites to *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), and *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997), for the proposition that "[i]f the kidnapping is merely incidental to the offense of robbery, [the defendant] cannot be found guilty of kidnapping as a separate offense" without violating due process. These two cases were recently overruled by *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012), in which our supreme court re-categorized this formerly due process-type claim as one concerning a failure to properly instruct the jury. In *White*, after conducting a thorough review of *Anthony*, *Dixon*, and other past decisions, our

supreme court explained: "While the Court in *Anthony* rested its holding on constitutional grounds, legislative intent and the strict construction of criminal statutes were also guiding principles." *Id*. at 576. After considering various amendments to the criminal code during in the intervening years, the court ultimately concluded that "the kidnapping statutes, 'construed according to the fair import of their terms,' Tenn. Code Ann. § 39-11-104, and coupled with their derivation from the Model Penal Code, evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id*. at 576-77. Consequently, our supreme court directed trial courts to "ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony," and provided trial courts with model instructions to give to juries to assist in this task. *Id*. at 578.

The defendant, who was tried in 2011, obviously neither requested nor received the jury instructions required by *White*, which was filed in 2012. The defendant's notice of appeal was filed on January 3, 2012, and his appeal was pending on March 9, 2012, when the decision in *White* was filed. Although the *White* court stated that its ruling did not require retroactive application, *see id.* at 578, our court has determined that limited retroactive application is appropriate with respect to cases that were already on appeal when *White* was decided. *State v. David Earl Scott*, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *11 (Tenn. Crim. App. Nov. 14, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013).

As an instruction-related error, any *White* error that might have been committed by the trial court would be subject to constitutional harmless error analysis. *See White*, 362 S.W.3d at 580 n.20 ("Because we cannot conclude *beyond a reasonable doubt* that the jury verdict would have been the same absent the instructional error, we cannot find the error harmless." (emphasis added)). Upon review of this record, we are able to conclude that any *White* error that might have occurred was harmless beyond a reasonable doubt. The victim's testimony—undisputed at trial and supported by the parties' joint stipulation concerning the duration of time that the facility's surveillance system remained offline—reflects that the defendant completed the aggravated robbery within the first five minutes of the ordeal, but he continued to hold the victim captive for well over an hour afterward. During this time, he moved her from room to room in an effort to disarm the facility's surveillance system, threatened and beat her repeatedly, and held her captive while he engaged in an extended discussion with customers directed toward encouraging them to leave—all in an effort to increase his odds of effectuating a successful escape. The victim's testimony is supported by the testimony of two other eyewitnesses, who engaged in extended interaction with the defendant and provided important corroboration of the general timeline. In light of this undisputed proof presented by the State, we conclude beyond any reasonable doubt that,

properly instructed, the jury would still have concluded that the victim's confinement went well beyond that necessary to accomplish the robbery, and its verdict would have been the same.

Consequently, we hold that any error stemming from the trial court's failure to provide the jury with a *White* instruction was harmless beyond a reasonable doubt. The defendant's claim that the evidence is insufficient to support his convictions—which we have construed as also raising a claim that the trial court erred by failing to properly instruct the jury as discussed in *White*—is without merit.

## II. SENTENCING ISSUES

The defendant claims that the trial court erred by failing to properly consider a statutory mitigating factor during sentencing and by imposing consecutive sentences. When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The defendant claims that the trial court erred by failing to consider the fact that the victim was released alive as a mitigating factor at sentencing. The law governing especially aggravating kidnapping provides that: "If the offender voluntarily releases the victim alive or voluntarily provided information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing." T.C.A. § 39-13-305(b)(2). The record from the sentencing hearing is clear that the trial court found that no statutory mitigating factors applied on the facts of this case.

We are not convinced that the trial court erred by failing to apply this mitigating factor in light of the facts of this case. The defendant's release of the victim was only "safe" and "voluntary" in the loosest sense of the terms. His presence at the crime scene had been detected by multiple witnesses. He was prevented from escaping without arousing their suspicion for an extended period of time, and he was eventually given only a narrow window of time in which to make his escape after they left the front office and went across the street. Using one or both of the two bullets that he possessed to kill the victim would almost certainly have aroused additional unwanted attention. Before fleeing the crime scene, the

defendant forcibly obtained the victim's identification, beat her severely, and promised to return and kill her and her entire family if she reported that he was the perpetrator. The defendant's decision to flee the crime scene without slaying the victim under these circumstances can hardly be considered an intentional "release" of the victim at all, much less a safe release of the voluntary sort that we believe the legislature intended for courts to consider as a mitigating factor. This court has not hesitated to hold that section 39-13-305(b)(2) is inapplicable when the facts of the case indicate that the defendant released the victim only after being compelled by circumstances to do so, or when the defendant did not release the victim in a safe manner. *See, e.g., State v. Christopher Fielder*, No. W2009-01663-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 663, at *38 (Tenn. Crim. App. Aug. 22, 2011) ("We do not feel that forcing a severely injured victim into the back of his own vehicle with a pillowcase over his head, and continuing to beat him until arrival at a destination where he is 'tossed' from the vehicle and left alone, without a vehicle, meets the statutory definition of voluntary release of the victim.").

Even if the trial court had erred by failing to apply this mitigating factor, the defendant would still not be entitled to any relief. The law is clear that "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." *Bise*, 380 S.W.3d at 709. A defendant's sentence will be upheld if it is within the appropriate range and generally complies with the principles and purposes of sentencing. *Id*. at 709-10. After reviewing the record in this case and considering the relevant sentencing statutes, we conclude that the defendant's twenty-five-year-sentence for especially aggravated kidnapping satisfies these criteria.

Finally, the defendant challenges the trial court's decision to impose consecutive sentences. Tennessee Code Annotated section 40-35-115(b)(4) provides that a trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." When ordering consecutive sentences pursuant to this factor, trial courts are directed to make two additional findings: 1) that the terms imposed are reasonably related to the severity of the offenses committed; and 2) that consecutive sentences are necessary in order to protect the public from further criminal acts by the offender. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

The defendant argues that the trial court did not make the second *Wilkerson* finding. The defendant also argues that this factor does not apply to him; in light of his criminal history, or rather his lack thereof, consecutive sentencing was not necessary to protect the public from further criminal acts committed by him.

The transcript of the sentencing hearing makes clear, however, that the trial court in fact found that both *Wilkerson* factors were satisfied. As the trial court stated, "I think that the criteria is met, that confinement for an extended period of time is necessary to protect society from this defendant's unwillingness to lead a productive life and resort to criminal activity in furtherance of that anti-social lifestyle. . . ." Prior to making this finding, the trial court did express a certain degree of "heartburn" about finding that the second *Wilkerson* factor was present in light of the fact that the defendant had no prior criminal record. The parties argued back-and-forth over the issue. However, the record is clear that the trial court ultimately resolved the issue against the defendant.

The facts of this case support the trial court's conclusion. The absence of a prior criminal record will often be a compelling factor in the defendant's favor when a trial court considers the issue of consecutive sentencing. However, it is not, standing alone, entirely dispositive of the *Wilkerson* inquiry. As the trial court found, the defendant expressed no remorse for his crimes. The defendant committed his crimes pursuant to a "well thought out and well planned scheme." The high degree of violence employed against the victim (which left the entire break room covered in blood) and the callous manner in which the defendant executed his crimes (against an eight-month pregnant woman and her unborn child), all indicate that, as the trial court found, this particular defendant exhibits an exceptional degree of depravity. On the facts of this case, the trial court was within its discretion to find that extended confinement was necessary to protect society from the danger posed by the defendant's potential to engage in future criminal conduct, even in the absence of any prior criminal record. We affirm the trial court's imposition of consecutive sentencing.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE