IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
October 25, 2007 Session Heard at Maryville[1]

## STATE OF TENNESSEE v. SUSAN MARIE GILLIAM CAMPBELL

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Hawkins County**
**No. CR552      James E. Beckner, Judge**

_____

**No. E2005-01849-SC-R11-CD - Filed January 18, 2008**

_____

We granted review to determine whether the Court of Criminal Appeals correctly determined that the evidence at trial was sufficient to support dual convictions of criminally negligent homicide and facilitating escape. Because the defendant, who was charged with the care of the five-year-old victim, took him swimming at a lake without notifying his parents, drank beer and used marijuana, and dared the victim into the water and then failed to supervise his activities, the evidence was sufficient to support the conviction of criminally negligent homicide. Because the defendant, after discovering the disappearance of the victim, discouraged immediate contact with the authorities so that her son, a fugitive from justice, could avoid the police, the evidence was also sufficient to support the conviction of facilitating escape. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Greg W. Eichelman, Public Defender, for the appellant, Susan Marie Gilliam Campbell.

Robert E. Cooper, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Leslie E. Price, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Douglas Godbee, Amber DePriest, and Virgil Everhart, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

[1] Oral argument was heard at the Blount County Justice Center in Maryville, Blount County, Tennessee, as a part of this Court's **S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents (S.C.A.L.E.S.) project.

The Defendant, who was tried jointly with Michael Zar, was found guilty of criminally negligent homicide and facilitating escape, both Class E felonies. The jury acquitted Zar. The trial court imposed concurrent sentences of two years for each of the defendant's convictions.

## Proof at Trial

On July 16, 2004, Susan Marie Gilliam Campbell (the "Defendant") was babysitting her four-year-old granddaughter and the five-year-old victim, William Blake Simpson. Without informing the victim's parents or seeking their permission, the Defendant took the children swimming at Cherokee Lake in Hawkins County, Tennessee. The Defendant invited her boyfriend, Willie Mullins, and her seventeen-year-old son, Travis Gilliam. They arrived at the lake at approximately 3:00 p.m. and were later joined by Carrie Hawley and Michael Zar.

Leanita Scott and her sister, Jeana Kenney, who were sunbathing on the lake's shoreline, were present when the Defendant, Mullins, Zar, and Gilliam, accompanied by the two children, waded through the water to a small island. At trial, Scott testified that she saw the Defendant and her adult companions drink beer and pass around a marijuana joint while the victim and the four-year-old granddaughter walked along the bank of the island. After acknowledging that she had also been using marijuana on the day of the drowning, Scott testified that she recalled seeing the victim give the Defendant's granddaughter "a round . . . tube." The victim was not, however, wearing a life jacket. Scott testified that the Defendant and the other adults directed the children to "get in the water" and remembered that the Defendant ridiculed the victim, commenting that "he had to grow up sometime." She testified that Zar also taunted the victim, who was playing both in the water and on the shore, warning him not to be "a pussy your whole life."

At one point during the afternoon, Scott, joined by Kenney, waded toward the small island to ask Gilliam if they could borrow his raft. The victim's "little tube" was on the shore. As Scott approached the island, she overheard the Defendant remark that she did not know where the victim was. The Defendant then screamed, "Where's Blake?" Scott and Kenney dove into the water, searching in vain for the victim. When Scott got out of the water to call 911, the Defendant and the others "started to yell for [her] not to call the police" because Gilliam "was a fugitive." According to Scott, the Defendant told the others to "get [Gilliam] out of there before the police got there because they would send him off or put him back in jail." As Scott placed the 911 call, she observed Zar and Gilliam walking toward their truck. Scott complained to Zar that she "couldn't believe he was going to leave with that little boy in the water." Although Zar returned, Hawley drove Gilliam away from the scene. According to Scott, the Defendant hid the group's cooler in "tall weeds" and did not enter the water to search for the victim.

During her testimony, Kenney confirmed that before the victim's disappearance, the Defendant and the other adults were drinking beer and smoking marijuana. Kenney recalled that when she last saw the victim, he was out "a little ways" on a pink raft. She joined Scott in their futile effort to locate the victim in the water.

Hawkins County Emergency Medical Services employee, Jamie Miller, spoke with the Defendant at the scene. The Defendant explained that the victim needed floatation arm bands in order to swim but was not wearing them when she last saw him. Miller described the Defendant as "excited" and "upset," but he could not determine whether she was intoxicated.

Michael Allen, a Hawkins County Sheriff's Deputy, described the Defendant as "withdrawn," but not in tears, when he arrived. He overheard the Defendant explain that she thought the victim had come out of the water. She speculated that he could be "wandering around in the woods." Allen also spoke to Scott, who informed him that the Defendant had been drinking and showed him where the cooler had been hidden. Allen testified that the cooler contained "some rolling papers," empty beer cans, and some cans that contained beer. Officers also found two life preservers, a float ring, and a "noodle" floating device on the small island. Allen did not find marijuana, nor did he observe whether the Defendant or the other adults were intoxicated.

Wayne Lovin, a law enforcement officer with the Tennessee Valley Authority, testified that the cooler contained ten empty beer cans and twelve full beer cans. Officer Lovin also observed several discarded beer cans on the island, along with several Styrofoam cups containing a yellowish liquid that he believed to be alcohol. He did not, however, find any marijuana in the possession of the Defendant or her companions.

Rogersville Police Officer Chris Pinkston, a diver for the Hawkins County Rescue Squad, arrived at the scene well after the victim's disappearance. After collecting information from witnesses, he devised a grid and began to search for the victim. Although the water visibility was poor, Officer Pinkston located the body by the use of a dragging device. The victim was found at a water depth of ten feet and approximately six feet from the shore.

Dewayne Broome, a Commander for the Tennessee Valley Authority's Criminal Investigation Division, questioned the Defendant. After obtaining a waiver of her Miranda rights, he learned that the Defendant, who had been babysitting her granddaughter and the victim for the past two days, was aware that the victim had been in the water nearly the entire time since their arrival. According to the officer, the Defendant claimed that the victim had been wearing an inflatable ring around his waist before his disappearance but had refused to wear a life jacket. She stated that she had last seen the victim standing near Hawley, who was inflating a float. She contended that she had been distracted by her granddaughter, who was crying, before she realized that the victim was missing. The Defendant informed Commander Broome that she had screamed for help before the others at the scene joined in the search. According to the officer, the Defendant admitted that her son, Travis Gilliam, who had escaped from the Mt. View Juvenile Home near Johnson City, had been staying with her. She denied having warned Scott "not to call the cops" and also denied that anyone in her group smoked marijuana prior to the drowning. She claimed that she had drunk only one-half can of beer during her time at the lake.

Commander Broome interviewed Michael Zar three days after the drowning. He recalled that Zar had stated that he and Hawley had been at the lake for only thirty minutes before the victim

-3-

disappeared. According to the officer, Zar claimed that the victim wore a "blow-up ring" around his waist each time he went into the water. Zar contended that Hawley was in the water blowing up a raft when the victim disappeared. While Zar claimed that he and Gilliam intended to search for the child as they walked towards his truck, he admitted that Hawley drove Gilliam away from the scene before the authorities arrived. Zar acknowledged drinking two beers but denied that he or anyone else in the group had been smoking marijuana. He insisted that he did not taunt the victim or call him names, explaining that he had instead called Gilliam a "wussy" for not trying to make conversation with Scott or Kenney.

Cindy Herron, the victim's mother, testified that she did not know that the Defendant intended to take the victim to the lake. She stated that the victim never swam without floats and had never before refused to wear his life jacket. She explained that she had not provided these items to the victim because she was unaware that the Defendant had any plans to go swimming.

Dr. Gretal Stephens, who performed the autopsy, determined that the victim had experienced a "wet" drowning. That is, he had inhaled water. According to Dr. Stephens, the water in the lungs contained some mud, suggesting that the victim may have been close to the bottom of the lake or on a slope in a shallow part of the water near the shore.

Nancy Davis, the Director of Court Services for the Hawkins County Juvenile Court, testified that Travis Gilliam had been placed in the legal custody of the Department of Children's Social Services on March 13, 2003. She stated that Gilliam was later prosecuted on delinquency charges, and that he was placed in a Level Three juvenile justice facility, which has the second highest security level. She recalled that some two months before the drowning, Gilliam was given a "pass" to visit an ill grandmother who was in the hospital in Kingsport. Davis testified that Gilliam did not return and remained on escape status until his arrest, over six months after the victim's death.

The jury convicted the Defendant of both criminally negligent homicide and facilitating escape. On appeal, the Court of Criminal Appeals concluded that the evidence was sufficient to support each conviction. Because of the uniqueness of the circumstances involved in each of the crimes, we granted review.

## Scope of Review

"When considering a sufficiency of the evidence question on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrg v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e). Because a verdict of guilt removes

the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

## ANALYSIS

### Criminally Negligent Homicide

The Defendant first contends that the evidence was insufficient to support a conviction for criminally negligent homicide. She argues that she took floatation devices for the victim to use, that her conduct did not cause his death, and that the drowning was purely accidental. In an excellent analysis, the Court of Criminal Appeals ruled that the jury reasonably concluded that the Defendant's negligence produced a sequence of events resulting in the death of the victim and that the evidence was, therefore, legally sufficient.

We begin by reviewing the relevant statutory provisions. A criminally negligent homicide occurs where "[c]riminally negligent conduct . . . results in death." Tenn. Code Ann. § 39-13-212(a) (2006). In order to support a conviction for criminally negligent homicide, the state must establish beyond a reasonable doubt the following elements: (1) criminally negligent conduct on the part of the defendant; (2) proximate causation; and (3) the victim's death. State v. Jones, 151 S.W.3d 494, 499 (Tenn. 2004); State v. Farner, 66 S.W.3d 188, 199 (Tenn. 2001).

Our legislature has provided guidance in the determination of when negligence qualifies as criminal in nature. "[A] person . . . acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(a)(4) (2006). "The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Id. Furthermore, "[w]hen the law provides that criminal negligence suffices to establish an element of an offense, that element is also established if a person acts intentionally, knowingly or recklessly." Tenn. Code Ann. § 39-11-301(a)(2) (2006).

By viewing the evidence in a light most favorable to the State, we must conclude that a rational jury could have found that the Defendant engaged in criminally negligent conduct proximately causing the victim's death. Initially, the Defendant, who had assumed the responsibility of care for the five-year-old victim, transported him to the lake without either seeking permission of his parents or notifying them of her intentions. She had no knowledge of the victim's swimming ability or of his prior experience with floatation devices. Secondly, the Defendant failed to closely supervise the victim despite a foreseeable risk of injury or drowning; a five-year-old near water having little visibility and a depth of ten feet signals danger. Moreover, there was evidence, although disputed, that the Defendant goaded the victim into the water despite his apparent reservations in doing so. Thirdly, there was proof that the Defendant joined her companions in the use of alcohol

-5-

and marijuana despite her responsibilities for child care. Her participation in either of those activities, a jury could have reasonably found, created a substantial and unjustifiable risk for the five-year-old victim as well as her four-year-old granddaughter. As the Court of Criminal Appeals aptly observed:

> A rational jury . . . could have found that the defendant's drinking and drug use while supervising children who could not swim constituted a gross deviation from the standard of care that an ordinary person would exercise and that the defendant knew or should have known that her conduct or the result of her conduct would imperil the life of the child.

Finally, the State offered evidence that the Defendant, when time was of the essence, attempted to thwart and perhaps did delay efforts to summon emergency help to the scene because her son, Travis Gilliam, might otherwise be discovered as a fugitive. Although the Defendant may have correctly alleged that no single act of negligence caused the victim's death, the evidence of her disregard of her supervisory responsibilities coupled with her failure to exercise minimal precautions in the face of a substantial and unjustifiable risk, when viewed as a whole, was sufficient to show that her gross negligence proximately caused the victim's death, which supports the conviction for criminally negligent homicide.

### Facilitation of Escape

The Defendant next argues that the evidence was insufficient to support a conviction for facilitating escape. She claims that because she did not actually help her son, Travis Gilliam, escape from the custody of a penal institution, she cannot be held culpable under the terms of the statute. The Defendant submits that her son's escape was some three months prior to the drowning, not when the State claimed she attempted to thwart his discovery. In response, the State emphasizes that an "escape" includes "failure to return to custody following temporary leave," maintaining that because escape is a continuing offense, the Defendant, by protecting Gilliam from contact with the police, facilitated his escape status.

Once again, we begin our analysis with the relevant statutory provisions. "It is unlawful for any person arrested for, charged with, or convicted of an offense to escape from a penal institution, as defined in § 39-16-601." Tenn. Code Ann. § 39-16-605(a) (2006).[2] An "escape" is the "unauthorized departure from custody or failure to return to custody following temporary leave for a specific purpose or limited period . . . ." Tenn. Code Ann. § 39-16-601(3) (2006) (emphasis added). Custody means "under arrest by a law enforcement officer or under restraint by a public servant pursuant to an order of a court." Tenn. Code Ann. § 39-16-601(2) (2006). Further, an individual commits the offense of facilitating escape where one "intentionally or knowingly

---

[2] This provision was amended in 2007 to state, "[i]t is an offense for any lawfully confined person arrested for, charged with, or found guilty of a civil or criminal offense to escape from a penal institution, as defined in § 39-16-601." Tenn. Code Ann. § 39-16-605(a) (Supp. 2007).

permit[s] or facilitate[s] the escape of a person in custody." Tenn. Code Ann. § 39-16-607(b) (2006).

While prior law required penal legislation to be strictly construed, the 1989 Act provides for an interpretation of criminal statutes "according to the fair import of their terms . . . to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39-11-104 (2006). In analyzing the scope and applicability of these statutes, the Court of Criminal Appeals, relying on an unpublished opinion filed over twenty years ago, began with the premise that escape is a continuing offense, the legislative intent being to sanction an ongoing course of conduct.[3] Although we have never addressed this issue in the context of an escape,[4] this Court has applied the continuing offense doctrine in a kidnapping originating in Alabama with the arrest in Tennessee, holding that "every moment an offense is continued, the offense is committed anew." State v. Legg, 9 S.W.3d 111, 116 & n.3 (Tenn. 1999). In Legg, this Court ruled that "[a]n offense may be considered a continuing offense only when 'the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that [the legislature] must assuredly have intended that it be treated as a continuing one.'" Id. at 116 (alteration in original) (quoting Toussie v. United States, 397 U.S. 112, 115 (1970)). Because kidnapping involved an interference with the liberty of the victim, this Court concluded that the crime continued until that liberty was restored. See id. at 117. We held that under the terms of the statute, no period of confinement could be "divided into multiple segments with various points of termination." Id.

Using rationale similar to our own in Legg, a majority of circuit courts in the federal system have held that escape is indeed a continuing offense. See, e.g., United States v. Lancaster, 501 F.3d 673, 680 (6th Cir. 2007); United States v. Audinot, 901 F.2d 1201, 1203 (3d Cir. 1990); United States v. Michelson, 559 F.2d 567, 570-71 (9th Cir. 1977); United States v. Cluck, 542 F.2d 728, 732 (8th Cir. 1976). Moreover, in United States v. Bailey, the United States Supreme Court ruled that it was

> clear beyond peradventure that escape from federal custody as defined in [U.S.C.] § 751(a) is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure. Given the continuing threat to society posed by an escaped prisoner, "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."

---

[3] State v. Tidwell, No. 85-72-III, 1986 Tenn. Crim. App. LEXIS 2245 (Tenn. Crim. App. Mar. 27, 1986) is an opinion authored by then Court of Criminal Appeals Judge Martha Craig Daughtrey.

[4] In State v. Odom, 928 S.W.2d 18, 27 (Tenn. 1996), this Court held that an aggravating circumstance in capital cases, that the murder occurred "during the defendant's escape from lawful custody or from a place of lawful confinement," did not apply after an escape has ended. See Tenn. Code Ann. § 39-13-204(i)(8). The Court reasoned that "[w]hen [the defendant] committed the murder, [his] escape was an accomplished fact – a *fait accompli*." Odom, 928 S.W.2d at 27. That particular ruling in Odom was based on the specific language of the aggravating circumstance, which differed from the language in the substantive offense of escape, but may be called into question by our decision today.

-7-

444 U.S. 394, 413 (1980) (quoting Toussie, 397 U.S. at 115); see also Lancaster, 501 F.3d at 680 (stating that the majority rule is "the better reasoned approach").

Further, the overwhelming majority of state courts have concluded that escape is a continuing offense. The seriousness of the offense of escape together with a manifest legislative purpose of deterrence are typical of the reasons for the interpretation that an escape does not end until the arrest. See, e.g., Harbin v. State, 581 So. 2d 1263, 1266 (Ala. Crim. App. 1991); Wells v. State, 687 P.2d 346, 350 (Alaska Ct. App. 1984); People v. Miller, 509 N.E.2d 807, 808-09 (Ill. Ct. App. 1987); State v. Francois, 577 N.W.2d 417, 420 (Iowa 1998); State v. Burnett, 195 N.W.2d 189, 189 (Minn. 1972); State v. Stull, 909 P.2d 1180, 1182 (Nev. 1996); State v. Lewis, 711 A.2d 669, 671 (Vt. 1998); Parent v. State, 141 N.W.2d 878, 881 (Wis. 1966).

We are persuaded that escape is a continuing offense under Tennessee Code Annotated section 39-16-601(3). The statutory language defining escape is broad, encompassing not only an "unauthorized departure from custody" but also a "failure to return to custody following temporary leave for a specific purpose or limited period." Tenn. Code Ann. § 39-16-601(3) (2006). Nothing in the statutory definition provides a basis for determining that an escape ends once an inmate has left the physical boundaries of the prison or has eluded capture for a certain period of time. Thus, the statutory language, coupled with the ongoing danger inherent in an escape, lends credence to the proposition that the offense is continuing in nature. Legg, 9 S.W.3d at 116-17; see also State v. Pickett, 211 S.W.3d 696, 701 (Tenn. 2007) ("Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" (quoting State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000)).

Whether the facilitation of an escape qualifies as a continuing offense is a more difficult question. Several federal decisions have indicated, for example, that the offense of assisting an escape "terminates once the escapee has reached temporary safety." United States v. Vowiell, 869 F.2d 1264, 1268 (9th Cir. 1989); see also United States v. Smithers, 27 F.3d 142, 144-45 (5th Cir. 1994) (holding that the offense of assisting escape ends once "immediate active pursuit" of the escapee ends); accord Orth v. United States, 252 F. 566, 568 (4th Cir. 1918). These decisions, however, are based primarily on the distinction in federal statutes between "the crime of assisting an escape" under 18 U.S.C. § 752 and the crime of "harboring or concealing an escaped prisoner" under 18 U.S.C. § 1072. Vowiell, 869 F.2d at 1267-68. In short, federal statutes specifically indicate that "[a]ssisting escapees after the escape is complete constitutes a separate crime – harboring or concealing escapees." Id. at 1269 (referring to 18 U.S.C. § 1072).

At least one state court, however, has rejected this distinction under their statutory scheme. See State v. Martinez, 781 P.2d 306, 309 (N.M. Ct. App. 1989). In Martinez, the defendant challenged three convictions for assisting escape by arguing that he was not involved in the inmates' escape from the penitentiary and that he did not assist the inmates until three weeks after their escape. Id. at 307. The New Mexico Court of Appeals rejected that assertion, holding that "[t]he crime of escape does not end at the prison door, nor at a point in time when a prisoner successfully

eludes immediate pursuit or reaches temporary sanctuary." Id. at 308. The court concluded that because escape was a continuing offense, a person "who intentionally aids a person to avoid recapture, who he knows has escaped from lawful custody, may properly be charged with the offense of assisting escape." Id. at 309. Moreover, the court specifically rejected the claim that the defendant's conduct amounted to harboring or concealing a fugitive but not assisting escape. Id. at 310. While federal statutes specifically proscribed "harboring or concealing 'any prisoner after his escape,'" the State of New Mexico had no such crime. Id. (quoting 18 U.S.C. §1072) (emphasis added).

In our view, the reasoning in Martinez is the more compelling of the alternatives. As stated, our definition of escape is broad, encompassing the failure to return from a temporary grant of release. Tenn. Code Ann. § 39-16-601(3) (2006). Additionally, Tennessee Code Annotated section 39-16-607(b) specifically defines the offense of facilitating escape as "intentionally or knowingly permit[ting] or facilitat[ing] the escape of a person in custody." The offense is complete whether or not the fugitive was charged with or convicted of a felony but increases from Class E to Class C if a felony. Tenn. Code Ann. § 39-16-607(c)(1), (3). In contrast, Tennessee Code Annotated section 39-11-411, which defines an "accessory after the fact," only pertains to those assisting felony offenders:

> (a) A person is an accessory after the fact who, <u>after the commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony</u>, and with the intent to hinder the arrest, trial, conviction or punishment of the offender:
>
>> (1) Harbors or conceals the offender;
>>
>> (2) Provides or aids in providing the offender with any means of avoiding arrest, trial, conviction or punishment; or
>>
>> (3) Warns the offender of impending apprehension or discovery.

Tenn. Code Ann. § 39-11-411(a) (2006) (emphasis added). While section 39-16-607 specifically addresses one who facilitates an escape from any kind of custody, section 39-11-411 only applies to one who harbors or conceals, aids, or warns one who has committed a <u>felony</u>. Our statutory scheme is more like that in New Mexico than in the federal system. Thus, our view is that escape qualifies as a continuing offense and that facilitation of an escape includes any assistance given to those who fail to return to custody.

From our interpretation of these statutory provisions and our determination that the escape is a continuing offense, we conclude that the evidence was sufficient to support the Defendant's conviction for facilitating escape. There was proof that the Defendant's son, Travis Gilliam, was being held in a Level Three juvenile justice facility. When granted a pass to visit an ill grandmother, he did not return. The Defendant was aware that her son failed to return to custody. She admitted

that he had been staying with her part of the time with the full knowledge that he was on escape status. Moreover, on July 16, 2004, after the victim disappeared and Scott called 911, the Defendant directed her companions "to get [her son] out of there before the police got there because they would send him off or put him back in jail." The Defendant's son left the scene with another individual and remained on escape status for over six months thereafter. Under these facts, a rational jury could have found that the Defendant intentionally or knowingly facilitated the escape status of her son. See Tenn. Code Ann. § 39-16-607(b) (2006).

## CONCLUSION

Because the evidence was sufficient to support the Defendant's convictions for criminally negligent homicide and for facilitating escape, the judgment of the Court of Criminal Appeals is affirmed. Costs are taxed to the Defendant, for which execution shall issue if necessary.

_____
GARY R. WADE, JUSTICE

-10-