# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
May 6, 2014 Session

## STATE OF TENNESSEE v. PHILLIP SMITH

**Appeal from the Circuit Court for Chester County**
**No. 12-CR-65     Honorable Donald Allen, Judge**

---

**No. W2013-02280-CCA-R3-CD  - Filed August 18, 2014**

---

The Defendant, Phillip Smith, was convicted by a Chester County jury for rape of a child, for which he received a sentence of 25 years to be served in the Department of Correction. On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction and that he is entitled to a new trial due to prosecutorial misconduct. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

William D. Massey and Joseph A. McClusky (on appeal), Memphis, Tennessee, and Mike Mosier (at trial) for the Defendant-Appellant, Phillip Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the rape of C.J.[1] ("the victim") in June 2008. The Defendant was indicted for rape of a child, a Class A felony, on November 1, 2012, and tried before a Chester County jury on April 9 and April 10, 2013.

**State's Proof.** The victim was born on June 30, 1998 and was 14 years old at the time of trial. He testified that he lived with his mother at 600 Nobles Road from 2003 until late

---

[1] It is the policy of this court to refer to minor victims by their initials.

June 2008. During that time, he became friends with the Defendant, who lived with his parents across the street at 675 Nobles Road. The victim testified that he would visit the Defendant's home two to three times per week to play video games and watch television with the Defendant.

In late June 2008, shortly before the victim and his mother moved, the victim visited the Defendant at his home when the Defendant's parents were not home. The victim recalled that his visit was between June 24 and June 28, 2008. He was nine years old at the time. The two went into the Defendant's bedroom "as usual" and the Defendant "started doing sexual things to [the victim]." The Defendant pulled off the victim's shirt and pants. When the victim told the Defendant to stop, the Defendant said, "Shut up, you little motherf*****" in a "rude and hateful" voice. The victim began to cry and tried to run out of the room, but the Defendant grabbed the victim by his arm and got a "sword-like thing out of the closet." The victim described the sword as a "samurai sword" with a long curved blade and thick handle. The Defendant "raised [the sword] up as if he were [going] to hit [the victim]" and threatened to kill the victim and his mother. The victim felt "scared[,] terrified."

The Defendant "shoved" the victim onto his bed, and the victim hit his head on the metal railing of the bed. The Defendant then "stuck" his penis in the victim's mouth after threatening to cut him with the sword. After several minutes, the Defendant turned the victim around and penetrated the victim's anus with his penis. The Defendant "was moving back and forth" and kept telling the victim, "Shut up, you little motherf*****" when the victim tried to yell. The victim said that when the Defendant penetrated his anus, "it hurt. It felt like someone had hit you with a hammer[.]" When the Defendant stopped and removed his penis, the victim saw that it had "white stuff on it." The Defendant then left the room, and the victim grabbed his clothes and ran outside. The victim ran to a field beside his house and hid behind some trees. He put on his clothes and cried in the field for about 30 minutes. He then went home and "acted like nothing happened" because he was afraid the Defendant would kill him and his mother. The victim testified that his "bottom" hurt for two days after the rape. Soon after the rape, the victim moved and never saw the Defendant again. The victim did not report the rape until 2012 after he had been accused of indecent exposure. He was assigned a counselor at Health Connect, an in-home treatment program, and disclosed the rape to his counselor during one of his sessions.

On cross-examination, the victim acknowledged that at the preliminary hearing, he testified about an incident where the Defendant raped him behind a shed on the Defendant's property. He did not testify about the incident in the Defendant's bedroom. He explained that the shed incident was "another time" and the incident in the Defendant's bedroom was the "last time."

Jason Crouse, an investigator with the Chester County Sheriff's Department, became involved in the case after receiving a referral from the Department of Children's Services. He observed the victim's forensic interview at the Carl Perkins Center on May 30, 2012. During the forensic interview, the victim described the incident in the Defendant's bedroom. Investigator Crouse interviewed the victim a month later, during which the victim described the incident behind the Defendant's shed.

Investigator Crouse interviewed the Defendant on June 5, 2012 at the Sheriff's Office. The Defendant's father drove the Defendant to the Sheriff's Office, and Investigator Crouse informed them of the allegations against the Defendant. The Defendant agreed to speak with Investigator Crouse about "his side of the story." After discussing the allegations, Investigator Course reduced the Defendant's statement to a writing. Investigator Crouse and the Defendant then read the statement "together" and the Defendant signed it. The Defendant's statement, which was introduced into evidence without objection, was read to the jury:

> Several years ago a boy named [C.J.] lived across the road from my house. I think he lived there for a year when we started hanging out. We would go to his house and play games with him, and he would come to my house and play games with me. We were always in sight at my parents['] [house] or his parents['] [house]. He had been to my house and in my bedroom, but the door stayed open. One time when I was at his house he exposed his privates to me. We were in the front yard. I turned away and told him not to do that. Another time we were together and he asked me about sex. I told him he needed to talk to his parents about that and told him I could possibly get in trouble for telling him anything about sex. I never did anything sexual with [C.J.].

On cross-examination, Investigator Crouse acknowledged that the Defendant denied all allegations and was cooperative throughout the interview.

**Defense's Proof.** Ray Smith, the Defendant's father, testified that the victim and his mother lived across the street from his home on Nobles Road from 2003 to 2008. During that time period, the victim visited Mr. Smith's home "two or three times a week" to play with the Defendant's "games and things." Mr. Smith explained that he did not feel comfortable with a "young boy" coming over that much, but he "felt sorry for [the victim]" because he did not have "anything to play with or do." The Defendant occasionally visited the victim's home as well, but Mr. Smith "never allowed him to go inside." Mr. Smith testified that he and his wife were "always there" when the victim came over to their home.

The Defendant never closed his bedroom door when the victim was there and his room was visible from the living room and office.

Mr. Smith described the victim as a "troubled child" who needed "guidance" and "care and love." He never saw any indication that the victim was afraid of the Defendant and never saw the Defendant mistreat the victim in any way. The last time he saw the victim was in 2011 when the victim accompanied his grandmother to the Smith's home to discuss a real estate transaction. The victim asked to play with the Defendant, but the Defendant was not home. Mr. Smith allowed the victim to go into the Defendant's room and play with his games.

On cross-examination, Mr. Smith testified that the Defendant was about 17 years old when the victim first began visiting. He acknowledged that the Defendant could have been left home alone "one time or another" but maintained that he would have known if the victim had come over while the Defendant was home alone. He agreed that "[t]here's a possibility" the victim could have come over when he and his wife were not home but was not aware of any such time. He testified that he was "leery" of the situation "because [of the victim] being so small and playing with an older boy." He explained that he was not concerned about "what [the Defendant] would do" but was concerned that the victim "could say something that would cause a problem." Mr. Smith testified that the Defendant is "sort of an autistic child" but acknowledged that the Defendant has never been tested or diagnosed with autism. He explained that the Defendant's mind is "maybe three to four years younger than his age." He testified that he often checked on the Defendant and the victim when the victim came over and reiterated that the Defendant was not allowed to have his bedroom door closed when friends were over.

The Defendant, 27 years old at the time of trial, testified that he lived with his parents on Nobles Road. He met the victim one day when he was walking outside, and they began "hanging out" together. The victim visited the Defendant's home two to three times a week to "play video games, things like that." The Defendant testified that his parents were home "[e]very single time" the victim visited. He recalled that the victim moved in with the victim's grandmother before June 2008.

The Defendant testified that he has two "katana" swords that he keeps on his bedroom wall for decoration, but he did not acquire these swords until after the victim moved away. He testified that he never threatened the victim with a sword and never noticed the victim appearing to be afraid of him. He also testified that his bed does not have any metal railings. The Defendant did not recall a time that the victim came over to visit when the Defendant's parents were not home and maintained that he "wouldn't have allowed him in" under those circumstances. He testified that his parents "very, very rarely" left him home alone and

recalled that they were usually in the living room or office when the victim came to visit. The Defendant adamantly denied that he ever sexually assaulted the victim.

On cross-examination, the Defendant recalled that his father expressed concern about "a young child being or spending time with an adult" because "you never know what a child might say." The Defendant said that he made sure his parents "would always be able to watch [him and the victim]." He described his relationship with the victim like "a father" or "an older brother . . . . trying to give him a good place to spend time . . . and, you know, make him a better person[.]" The Defendant recalled that occasionally the victim would bring up things of a "sexual nature," but the Defendant would tell the victim that he needed to speak to his mother about that. He did not tell his parents about these conversations. The Defendant testified that the victim exposed himself to the Defendant one time when the Defendant was at the victim's house. He said that it occurred in the victim's front yard and that he looked away and told the victim "he didn't need to do that." He did not tell his parents or the victim's mother about this incident.

Michael Hatch, a childhood friend of the Defendant, testified that he met the Defendant when a family member set up a "play date" for them. Mr. Hatch was seven years old, and the Defendant was fourteen years old. He testified that the Defendant has a good reputation for truthfulness and veracity in the community. On cross-examination, Mr. Hatch said that he and the Defendant occasionally "jok[ed]" about sex but never discussed it as a "serious matter." Mr. Hatch never saw any "odd sexual behavior" from the Defendant and never knew the Defendant to have a girlfriend or boyfriend. Mr. Hatch recalled that the Defendant occasionally played with the victim and the Defendant's niece, both of whom were much younger than the Defendant. He described the Defendant's interaction with these children as "like a big uncle or a big brother." The Defendant also had other friends who are 18 to 20 years old.

Debra Smith, the Defendant's mother, testified that the victim came to their house two to three times a week to play video games with the Defendant. She testified that either she or Mr. Smith was always at the house when the victim came over to play. She never noticed anything unusual about the victim's appearance after he had been playing with the Defendant. He did not appear scared or nervous and his clothes were not in disarray. Mrs. Smith recalled that the victim moved several months before his mother in 2008 but could not recall what month. She saw the victim again in 2011 when he came over to the Smith's house with his grandmother. She recalled that he asked to see the Defendant, but the Defendant was not home. She never saw the Defendant do anything improper with the victim.

On cross-examination, Mrs. Smith testified that the Defendant was never left alone at home and that he was required to leave his bedroom door open whenever he had any friends over. She did not have any concerns about the Defendant hanging out with the victim because "[she] was there watching him." She explained that it was her "mother's instinct" that prompted her to watch her son when the victim was over.

**State's Rebuttal Proof.** The victim recalled accompanying his grandmother to the Defendant's house in 2011. He testified that he did not get out of the car and did not see the Defendant while he was there. He saw the Defendant's mother and waived to her from the car but did not speak to her or ask about the Defendant.

Following deliberations, the jury convicted the Defendant as charged in the indictment for rape of a child. The Defendant received a sentence of 25 years' confinement at 100%. On June 26, 2013, the Defendant filed a timely motion for new trial, raising, inter alia, sufficiency of the evidence and prosecutorial misconduct. Following a hearing, the trial court denied the motion by order on September 11, 2013. The defendant filed a timely notice of appeal to this court on October 9, 2013.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction and that he is entitled to a new trial due to prosecutorial misconduct under a plain error review. The State responds that the evidence is sufficient to sustain the Defendant's convictions and that the Defendant has failed to establish plain error. Upon review, we agree with the State.

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his conviction for rape of a child. He maintains that there was "ample rebuttal proof to discredit the testimony of [the victim]," and therefore, his conviction cannot stand. The State responds that the evidence, viewed in the light most favorable to the State, is sufficient to support the Defendant's conviction and any conflict in the evidence was resolved by the jury with their verdict. We agree with the State.

We begin by recognizing that the State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia,

443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

In the case sub judice, the Defendant was convicted of rape of a child under Tennessee Code Annotated section 39-13-522(a) (2010), which provides that "rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7) (2010).

The Defendant acknowledges that the victim provided a detailed account of the rape, satisfying the elements of rape of a child. However, he asserts that the defense witnesses sufficiently rebutted the testimony of the victim, which was the only evidence of the Defendant's guilt, such that his conviction cannot stand. In other words, the Defendant urges this court to conclude that the jury erred in accrediting the testimony of the State's witnesses over that of the Defendant's witnesses. We decline to do so.

At trial, the victim described in detail the rape that occurred between June 24 and June 28, 2008, when the victim was nine years old. The victim testified that the Defendant's parents were not at home that day, and when he and the Defendant went into the Defendant's

bedroom, the Defendant "started doing sexual things" to the victim. The victim tried to resist, but the Defendant threatened him with a sword. The Defendant then "stuck" his penis in the victim's mouth and penetrated the victim's anus with his penis. The Defendant offered opposing testimony, maintaining that he was never alone with the victim at his home and that he never committed any sexual acts with the victim. The Defendant's parents likewise testified that the Defendant was never, to their knowledge, at home alone with the victim. They further testified that the they constantly monitored the Defendant when the victim was at their home and never observed any inappropriate behavior.

After considering the conflicting testimony of the victim and the Defendant's witnesses, the jury returned a verdict of guilty for rape of a child, clearly accrediting the testimony of the victim over that of the Defendant's witnesses as was their prerogative. See Campbell, 245 S.W.3d at 335. We will not reweigh or reevaluate this evidence on appeal. See id. Further, the Tennessee Supreme Court has determined that the testimony of a child victim, alone, is sufficient to uphold a conviction for child rape. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); see State v. Warren Curnutt, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *11 (Tenn. Crim. App., at Nashville, May 22, 2007), perm. app. denied (Tenn. Sept.17, 2007). A jury's verdict will not be overturned on appeal "unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" Elkins, 102 S.W.3d at 582-83 (quoting State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). Considered in the light most favorable to the State, a rational juror could have found the Defendant guilty of rape of a child beyond a reasonable doubt. Accordingly, the Defendant is not entitled to relief.

**II. Prosecutorial Misconduct.** The Defendant argues that the State committed prosecutorial misconduct during closing argument, warranting the granting of a new trial. The Defendant concedes that he did not contemporaneously object to these comments during trial; however, he maintains that the errors rise to the level of plain error and should, therefore, be reviewed by this court. The State responds that the Defendant has failed to establish plain error and is not entitled to relief.

Generally, when a defendant fails to contemporaneously object to a prosecutor's closing argument, the issue is waived. See Tenn. R. Crim. P. 33; Tenn. R. App. P. 36(a). However, this court has, at its discretion, reviewed allegations of prosecutorial misconduct as plain error even in the absence of a contemporaneous objection. See State v. Armstrong, 256 S.W.3d 243, 249 (Tenn. Crim. App. 2008) (citations omitted). The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. An attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). However, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Stephenson, 195 S.W.3d at 603 (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). In other words, in order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

(1) the conduct complained of viewed in the light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper arguments;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

There are five general areas of potential prosecutorial misconduct related to closing argument:

(1) It is unprofessional conduct for the prosecutor to intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

(2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant.

(3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Sexton, 368 S.W.3d 371 (Tenn. 2012) (quoting State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)); see also American Bar Association, Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 (1970).

In the present case, the Defendant complains of a number of comments made by the prosecutor during closing argument. Specifically, he asserts that the prosecutor "made numerous improper arguments . . . designed to inflame the jury's passions," and that he "mischaracterized and misstated the testimony" of the Defendant's witnesses. Some of the complained of comments, when read in context, fall squarely within the permissible bounds of closing arguments. For example, the Defendant complains that the prosecutor made repeated pleas for sympathy for the victim by telling the jury that the victim has "had to

recount and relive this rape" multiple times. Similarly, the Defendant complains that the prosecutor improperly urged the jury to consider another alleged incident of abuse that occurred behind a shed on the Defendant's property.[2] However, considered in context, these comments were aimed at resolving any credibility issues with the victim's testimony and were within the realm of permissible argument. The prosecutor told jurors:

> [Y]ou saw [the victim] shake, and you saw him mumble, and he didn't really want to talk about it, that's why. . . . Unfortunately, we have to make him relive this over and over[.]
>
> . . . .
>
> [Defense counsel] tried to make it look like [C.J.] was inconsistent and that's a typical defense strategy. . . . [C.J. said] that [the shed incident] was another time. That was his answer. It's unfair to try to paint an inconsistency where there is no inconsistency[.]
>
> . . . .
>
> Now for your purposes today, for this trial, you are only focusing on the rape in the bedroom, the anal rape. But you can remember what the testimony is.

Contrary to the Defendant's assertions, these comments do not improperly encourage the jury to base its verdict on sympathy for the victim or to consider another alleged incident of abuse. The credibility issues with the victim's testimony were fairly raised by the evidence and properly discussed by the prosecutor during closing argument. We discern no impropriety in these comments.

Of greater concern to us is the Defendant's assertion that the prosecutor mischaracterized and misstated the testimony of Ray and Debra Smith, the Defendant's parents, by suggesting that the Smiths knew that their son would rape a child. Specifically, the prosecutor told the jury:

> [The Defendant] is grooming [the victim] to rape him. Trying to develop a rapport and trying to develop a relationship with this little boy, and the parents know it, too. That's why they said, "You better keep that door open. We want

---

[2] We note that the Defendant opened the door to testimony and argument regarding the alleged shed incident by questioning the victim about it during cross-examination.

to see what you're doing in there. We don't want that boy over here when we're not here." That's what's really going on. They're not going to tell you that because that would make their child look bad. <u>They would have to admit to themselves that they've got a monster living in their house</u>.

They don't trust him. You heard from [the Defendant's] mama, even now at 27, she still doesn't trust him.

That's a big red flag that something is very wrong in that house, and they know something's very wrong in that house.

Do you trust [your children] more at 13 than you do at 21? That doesn't make any sense, unless this boy has – this man here has shown some bad signs and we're worried about him. This isn't good. He seems to like children who are not any connection to him, and it's not good. This is not good. We don't need to leave him at this home alone.

[Ray Smith] said, "I know how kids are." I think he meant to tell you, I know how my kid is. I know what's wrong with my – there's something wrong with him. I can't trust him alone. I can't trust him around children. I don't want to let him have [sic] out of my sight because I'm so scared what's going to happen. And he even told you, "I was afraid something like this was going to happen." It sure did. "Oh, I was just scared the kids were going to say something." But what's really going on, he was scared. <u>I just knew [the Defendant]'s going to rape a kid</u>. If we're not watching him all the time, if we just leave him to his own devices, <u>he's going to rape somebody</u>. <u>He'll rape a kid</u>. We've got to watch him as closely as we possibly can because <u>he's going to rape a kid</u>.

Unlike the previously discussed comments, these comments, in our view, fall outside the bounds of reasonable, permissible closing argument. As noted by the Defendant, the prosecutor did not make subtle changes or paraphrase the testimony of the Defendant's parents. Further, he did not merely suggest reasonable inferences that could be drawn from the Smiths' testimony. Instead, he repeatedly misstated the Smiths' testimony, telling the jury that the Defendant's parents testified that they "knew [the Defendant was] going to rape a kid. . . . He'll rape a kid. . . . [H]e's going to rape a kid." These comments were improper misstatements and mischaracterizations of the Smiths' testimony. Additionally, the prosecutor's reference to the Defendant as a "monster," albeit indirectly, was likewise improper and potentially appealed to the bias and passion of the jury. <u>See, e.g.</u>, <u>State v.</u>

Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998) ("evil one"); State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) ("rabid dog").

Notwithstanding the impropriety of these comments, the Defendant is not entitled to relief absent a showing that misconduct affected the outcome of the trial to the prejudice of the defendant. See Cauthern, 967 S.W.2d at 737 (concluding that the prosecutor's argument, "while highly improper, did not affect the verdict to the prejudice of the defendant," and therefore, did not entitle the defendant to relief). The prosecutor's comments comprised only a portion of his argument. He discussed at length the evidence presented and the credibility of the victim, upon whose testimony the prosecution rested. Further, the improper comments were directed at the testimony of the Defendant's parents and whether they believed that the Defendant was capable of such conduct, which had no bearing on whether the Defendant actually committed rape of a child. The evidence of the Defendant's guilt, while not overwhelming, was more than sufficient. The victim provided a detailed account of the rape and adequately explained any apparent inconsistencies in his testimony. We cannot conclude that the jury's verdict was impacted by the prosecutor's improper comments.

Further, we must be mindful that the issue was presented to us for plain error review. Appellate courts are advised to use plain error review "sparingly" and cannot provide relief absent a showing of all five Adkisson factors. See State v. Armstrong, 256 S.W.3d at 249. In the case sub judice, we are not persuaded that the Defendant has carried his burden of persuasion in establishing plain error. First, the Defendant has not established that his failure to object was not a tactical decision. In defense counsel's closing argument, he cautioned the jury that "[n]othing [the prosecutor] has said is evidence," and addressed the prosecutor's comments head on. He told the jury that the prosecutor had "greatly mischaracterized" the testimony of the Smiths and then presented his own interpretation of the testimony. Thus, the record suggests that the failure to object was not an inadvertent or negligent oversight by defense counsel, but rather a strategic decision to rebut the prosecutor's comments with defense counsel's own argument.

Additionally, we are not convinced that a substantial right of the accused was adversely affected or that consideration of the issue is necessary to do substantial justice in this case. "For a substantial right of the accused to have been affected, the error must have prejudiced the [defendant]. In other words, it must have affected the outcome of the trial court proceedings." Armstrong, 256 S.W.3d at 250 (citations omitted). This is essentially the same requirement as that required to find prosecutorial misconduct. Id. (citing Goltz, 111 S.W.3d at 5). This inquiry is akin to the harmless error analysis under Tennessee Rules of Appellate Procedure 36(b), but the defendant bears the burden of persuasion in the plain error context. Id. (citations omitted). As discussed above, the Defendant failed to establish that the prosecutor's comments affected the jury's verdict. Thus, the Defendant has not

-13-

established the existence of all five of the factors necessary for plain error review. Accordingly, review of this issue under plain error is not necessary to do substantial justice. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE